No. 2—10—0749
Opinion filed March 24, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* PAUL L. F., | ) | Appeal from the Circuit Court of |
| | ) | Winnebago County. |
| a Minor | ) | |
| | ) | No. 05—JA—352 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Edith F., | ) | Patrick L. Heaslip, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justice Zenoff concurred in the judgment and opinion.
Justice Hudson dissented, with opinion.

**OPINION**

Respondent, Edith F., appeals from the trial court's order terminating her parental rights to her minor son, Paul L. F. We reverse and remand.

Paul L. F.. was born on April 6, 2005. On December 5, 2005, the State filed a three-count petition alleging that Paul was a neglected minor pursuant to section 2—3 of the Juvenile Court Act of 1987 (705 ILCS 405/2—3 (West 2004)), in that: (1) he was born with cocaine in his urine, blood, or meconium (705 ILCS 405/2—3(1)(c) (West 2004)); (2) his environment was injurious to his welfare because respondent had a substance abuse problem that prevented her from properly parenting him (705 ILCS 405/2—3(1)(b) (West 2004)); and (3) his environment was injurious to his

welfare because his father, Paul F., Sr.,[1] had a substance abuse problem that prevented him from properly parenting him (705 ILCS 405/2—3(1)(b) (West 2004)). Respondent, for whom counsel was appointed, waived her right to a shelter care hearing, and the court granted temporary custody and guardianship of Paul to the Department of Children and Family Services (DCFS), with discretion to place him with a relative or in traditional foster care. Respondent subsequently stipulated to count I of the petition, and the State dismissed the remaining counts. The court adjudicated Paul a neglected minor and made him a ward of the court. Respondent was ordered to cooperate with DCFS and to remain drug-free. The initial permanency goal of short-term care with a return home in less than one year was established in September 2006.

There followed a series of seven more permanency reviews and various other hearings and court dates. Respondent was represented by six different attorneys during this period. On November 23, 2009, the State filed a five-count petition for termination of parental rights and for power to consent to adoption. From that point, one of the previous attorneys and four new attorneys represented respondent. After a hearing on April 8, the trial court found respondent unfit pursuant to four of the five counts. On June 23, following a hearing, the trial court found that it was in Paul's best interests that respondent's parental rights be terminated. This appeal followed.

Respondent first contends that she was denied effective assistance of counsel because two of her appointed counsel also represented other parties at various times in these proceedings. Respondent was represented by 10 different attorneys throughout the course of the proceedings in the trial court. Matthew Jura appeared on behalf of respondent on April 13, 2010, after previously

---

[1]Paul F., Sr.'s, parental rights were terminated along with respondent's, but he is not a party to this appeal.

appearing on behalf of Paul F., Sr., five times. Shannon Reeves-Rich appeared on respondent's behalf at an April 20, 2010, permanency hearing after having represented both Paul F., Sr., and Paul previously. Both Jura and Reeves-Rich made their appearances for respondent after the court had found respondent to be an unfit parent.

The State responds that Jura's representation of respondent was *de minimis*; indeed, Jura's only action on April 13 was to ask for a continuance "for a couple of reasons":

"[M]y understanding is [respondent] is in a jury trial over in Courtroom D this morning, um, which is why she's not here. And I also represented the father on this case, [Paul F., Sr.], for some time; so I have a conflict on this case. I don't know if there is anybody else available to come down here this morning.

* * *

I tried to do that yesterday, but to no avail."

However, the State fails to address the appearance of Reeves-Rich on respondent's behalf at a permanency hearing during which respondent and a caseworker testified.

This court recently held that a *per se* conflict of interest, requiring reversal of a termination of parental rights, arose when the same attorney appeared on behalf of both the respondent mother and the minor at different times during the same proceedings. *In re Darius G.*, No. 2—10—0685 (Ill. App. Dec. 15, 2010). In *Darius G.*, we propounded a "clear rule" that "the *same* attorney may not during the proceedings appear on behalf of *different* clients." (Emphases in original.) *Darius G.*, slip op. at 15-16. In such a situation, "[p]rejudice is presumed and respondent need not demonstrate that the conflict contributed to the judgments entered against her." *Darius G.*, slip op. at 16. The application of such a rule will "inform the trial court not to accept an appearance from an attorney

who already, at some point during the proceedings, appeared on behalf of another party." *Darius G.*, slip op. at 16. Both the trial court and counsel appointed in juvenile proceedings must remain aware of the parties' representation; the termination of parental rights is a drastic measure, and the strict procedural requirements adopted to regulate such proceedings "are paramount." *Darius G.*, slip op. at 16; see also *In re E.B.*, 231 Ill. 2d 459, 463-64 (2008).

This case presents a scenario similar to, but even more convoluted than, that presented in *Darius G.*: one of respondent's 10 attorneys represented two other parties and another of her attorneys represented one other party during the course of the proceedings. The clear rule of *Darius G.* applies here; prejudice is presumed in the unacceptable rotation of representation and mandates that we reverse the judgments of the trial court finding respondent to be an unfit parent and terminating her parental rights and that we remand the cause for further proceedings.

REPLY TO THE DISSENT

Without citation to authority, the dissent rejects the *per se* standard and argues that a showing of prejudice should be required in such situations. Slip op. at 10. Contrary to the implications and presumptions contained in the *per se* rule, the dissent determines that Reeves-Rich's conflict in this case is "*de minimis,*" without the benefit of *any* evidence as to what transpired when she counseled both Paul and Paul F., Sr., before representing respondent. Slip op. at 10. The dissent flips the rule on its head: prejudice is presumed *not* to have occurred even in the absence of an opportunity to establish prejudice.

The dissent cites for support only one case involving a conflict of interest in a juvenile case, *In re D.B.*, 246 Ill. App. 3d 484 (1993). However, *D.B.* is clearly distinguishable. In that case, the respondent mother hired an attorney who had earlier appeared as the minor's appointed guardian ad

litem for over two years of the proceedings. However, the attorney told the respondent mother about the prior representation and that he did not think that there would be a conflict of interest. *D.B.*, 246 Ill. App. 3d at 492. The respondent mother continued with the attorney's representation. Here, respondent was represented by a parade of 10 attorneys during the course of these proceedings. There is nothing in the record to indicate that respondent had any idea that 2 of her 10 attorneys had other, conflicting involvements in the case. There is also nothing to indicate that she had been admonished that she had the right to the undivided loyalty of any attorney appointed to represent her and that, if an attorney violated his or her ethical duties regarding representation, the burden was on respondent to bring it to the court's attention.

The dissent also laments the "tremendous waste of the resources of the parties and the court system," supposedly caused by the application of the *per se* rule. Slip op. at 10. However, the dissent's undefined, nondescript procedure for making a showing of prejudice is not designed to stop this ongoing problem of attorneys representing multiple parties in the same proceedings; it casually compromises the integrity of representation by appointed counsel and leaves the issue to be resolved down the road by some higher authority. Which system makes such waste less likely to occur: one that prevents the potential of conflict by "inform[ing] the trial court not to accept an appearance from an attorney who already, at some point during the proceedings, appeared on behalf of another party" *(Darius G.*, slip op. at 16), or one that waits until *after* the improper representation occurs, then requires, at best, the opportunity for a hearing to determine if prejudice occurred, and, if it has, requires the appointment of new counsel and a new termination proceeding?

Further, the dissent fails to address how such a showing should be made. What type of hearing would be held? Would discovery be allowed? What would be the nature and extent of

discovery? Who would bear the burden of going forward? What would be the burden of proof? Who would bear the burden of proof? If the burden is on the parent, then must the parent waive the attorney-client privilege in order to establish that, first, there was a conflict, and, second, it prejudiced the parent? Is prejudice determined by a showing of a lack of undivided loyalty and a different result or merely an undivided loyalty? If the State must establish lack of prejudicial error, must it do so by clear and convincing evidence? Must additional unconflicted attorneys be appointed to represent the parent and the potentially conflicted attorneys? What happens if unconflicted attorneys are appointed to represent multiple parties in conflicts that create subsequent *per se* conflicts? May a parent force a conflicted attorney to testify about confidential matters with other parties represented by the conflicted attorney? May attorneys be forced to disclose matters protected by the attorney-client privilege when the child or the other parent refuses to waive the privilege? Does an irrebuttable presumption arise if the attorney does not comply with discovery or fails to testify? Does it depend on waiver by the other party-client? What contempt powers should be implemented to enable the parent or the State to present evidence? Will *in camera* inspections be required to determine if some privileged matters must be disclosed absent waiver? Will the trial judge have to recuse himself or herself after the privileged material is presented to the court, in order to avoid the appearance of impropriety arising from the fact that the trial judge is now aware of confidential information that he or she would not otherwise be privy to and that could cause a bias or prejudice to arise in the judge? Will the hearing have to be transferred to a judge not otherwise involved in the proceedings, in order to insulate the trial judge from learning of the privileged material? Is a later-appointed attorney who fails to recognize and raise the existence of an earlier *per se* conflict himself or herself *per se* ineffective? The dissent neither discusses the procedures needed to review and determine whether

a conflict is *de minimis* nor considers whether the additional proceedings are more or less wasteful than the application of the rule.

Contrary to the dissent, the imposition of the *per se* rule in no way hamstrings the " 'well-intentioned public defenders whose only desire was to represent unrepresented indigent parties.' " Slip op. at 10. The rule, if properly followed, prevents these attorneys from being placed in the untenable and potentially unethical position of having their loyalties divided by representing multiple parties in the same proceeding. See, *e.g.*, Ill. S. Ct. Rs. of Prof. Conduct, R. 1.7(a)(1) (eff. Jan. 1, 2010) (providing that a lawyer shall not represent a client if the representation involves a "concurrent conflict of interest" that exists where "the representation of one client will be directly adverse to another client"). Application of the *per se* rule and the Rules of Professional Conduct would impose no additional burdens on trial courts or attorneys, as we trust that the courts keep track of the appearances filed in a case and that the attorneys know whom they represent in a particular proceeding. Any judicial system that does not provide at least this minimum level of compliance with rules of conduct, competence, and due process cannot be considered worthy of confidence.

Occam's razor—"*Pluralitas non est ponenda sine neccesitate*" ("plurality should not be posited without necessity")—is popularly interpreted to mean, "the simpler the explanation, the better." (Internal quotation marks omitted.) *In re Faith B.*, 359 Ill. App. 3d 571, 577 (2005) (McLaren, J., specially concurring). The dissent attempts to avoid the admonition of Occam's razor by failing to set forth the pluralities that would arise in attempting to determine if a prejudicial violation occurred. The *per se* rule is the simple explanation of how to resolve this recurring problem, and it should be followed. When a *per se* conflict is recognized, it should immediately be brought to the trial court's attention to be remedied, either by having the party waive the conflict or

by discharging the attorney. Waiting until after a conflict arises to hold a hearing to determine the level of the conflict of interest and the amount of prejudice encourages waste and delay and does nothing to encourage the "competing interest in stability and finality." Slip op. at 14. Awareness and strict compliance with the *per se* rule by the trial courts and attorneys prevent conflicts and the waste of resources, encourages finality, and preserves the integrity of judicial proceedings.

Reversed and remanded.

JUSTICE HUDSON, dissenting:

In this case as well as the recent case of *In re Darius G.*, No. 2—10—0685 (Ill. App. Dec. 15, 2010), this court has applied a *per se* rule holding that even a theoretical conflict of interest, no matter how insignificant, serves as a basis for undoing a lengthy juvenile court proceeding concerning the care and custody of a minor. I disagree with these holdings; accordingly, I respectfully dissent.

While there are cases that support the majority's position, as well as the position of the court in *In re Darius G.* (see *In re S.G.*, 347 Ill. App. 3d 476, 479 (2004)), there is also conflicting authority. In *In re D.B.*, 246 Ill. App. 3d 484, 492 (1993), the Fourth District of this appellate court limited the *per se* conflict rule, declining to apply it to a case where an attorney represented a minor and a respondent mother, because the representations were not simultaneous and the mother was aware that the attorney had previously represented the minor. Under such circumstances, the Fourth District concluded, a showing of prejudice was necessary. *In re D.B.*, 246 Ill. App. 3d at 492.

*In re C.C.*, 368 Ill. App. 3d 744 (2006), also provides sound guidance. In that case, the court considered whether to apply in a termination proceeding the standard set forth in *United States v. Cronic*, 466 U.S. 648 (1984), for assessing the performance of counsel. Under *Cronic*, a criminal case, counsel's representation is inadequate where counsel completely fails to subject the State's case

to meaningful adversarial testing. *Cronic*, 466 U.S. at 659. Prejudice is presumed. *In re C.C.*, 368 Ill. App. 3d at 748. The court declined to apply this standard in a termination proceeding, explaining:

"It seems counterintuitive to apply a test that depends upon a determination of whether the proceeding was sufficiently adversarial in nature when the legislature has specified that proceedings under the Act are not meant to be adversarial in nature. See 705 ILCS 405/1—5 (West 2004). A respondent parent's right to counsel in termination proceedings derives from the Act, not the constitution. *In re A.H.*, 359 Ill. App. 3d 173 (2005); 705 ILCS 405/1—5 (West 2004). Hence, the sixth-amendment analysis and rationale delineated by *Cronic* and its progeny, stating that '[t]he right to effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing,' does not apply here. *Cronic*, 466 U.S. at 656[.]" *In re C.C.*, 368 Ill. App. 3d at 748.

The court then applied the more familiar standard taken from *Strickland v. Washington*, 466 U.S. 668 (1984), and found that the respondent had not shown prejudice. *In re C.C.*, 368 Ill. App. 3d at 747-48. If prejudice cannot be presumed from an actual breakdown of the adversarial system, it would be incongruous to presume prejudice where an attorney simply has some theoretical conflict of interest.

*In re Kenneth F.*, 332 Ill. App. 3d 674 (2002), is also instructive. There, this court applied a harmless-error analysis to the failure of the trial court to properly admonish a respondent in a termination case. We explained:

"In proceedings of the present kind, where a primary purpose is to protect the best interests of the children, a harmless-error analysis is particularly appropriate. See *In re Smith*, 77 Ill. App. 3d [1048,] 1052 [(1979)]. An error that prejudices no one should not prevent children,

who are the objects of these proceedings, from attaining some level of stability in their lives."

*In re Kenneth F.*, 332 Ill. App. 3d at 679-80.

Hence, in *In re Kenneth F.,* we recognized the importance of finality in a termination proceeding over the procedural rights of a respondent where the violation of those rights did not prejudice the respondent.

Absent a showing of prejudice, the same result should obtain here (and I would remand this case to allow respondent to attempt to make such a showing). Instead, the majority undoes nearly five years of litigation because an attorney (Reeves-Rich) made a single appearance on behalf of the minor on September 11, 2006, and an appearance on respondent's behalf on April 20, 2010.[2] Thus, as far as one can tell from the record, the conflict upon which the majority relies is an exceedingly mild one. To allow such a *de minimis* violation of the *per se* conflict rule to undo the whole proceeding needlessly prolongs an already lengthy proceeding and denies stability to the minor whom this proceeding is designed to protect. It is also a tremendous waste of the resources of the parties and the court system. Further, as the State points out, the "practical effect of the new *per se* limitation respondent seeks to impose *** would hamstring well-intentioned public defenders whose only desire was to represent unrepresented indigent parties."

Undoubtedly, the effective assistance of counsel is an important right; however, finality—always an important consideration (see, *e.g.*, *In re Liquidation of Legion Indemnity Corp.*,

---

[2]The majority seems to accept the State's argument that Jura's representation was so insignificant that it created no conflict. Reeves-Rich also represented the respondent father on March 29, 2010. It is not, however, apparent to me how respondent and the father are necessarily "parties with adverse objectives." See *In re S.G.*, 347 Ill. App. 3d at 481.

373 Ill. App. 3d 969, 974 (2007))—takes on added significance in termination cases. These cases are among the small class of cases subject to mandatory acceleration on appeal. See Ill. S. Ct. R. 311 (eff. Feb. 26, 2010); see also *In re Marriage of Carrillo*, 372 Ill. App. 3d 803, 811 (2007). A *per se* rule that allows—indeed, requires—reversal for an error that is not prejudicial does not strike a proper balance between a party's right to counsel and a child's need for finality.

Accordingly, I would reject the *per se* standard in cases like this one. The *per se* standard was imported from criminal cases, and I, too, would seek guidance from the criminal law and its well-developed framework for dealing with conflicts of interest. In *People v. Flores*, 128 Ill. 2d 66, 84 (1989), our supreme court held, "Where a *per se* conflict of interest is not established, it is the defendant's burden to show an actual conflict of interest and to demonstrate prejudice." Under such circumstances, "If a *per se* conflict does not exist, a defendant may still establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *People v. Hernandez*, 231 Ill. 2d 134, 144 (2008).[3] It is not necessary to make the additional showing that the deficiency contributed to the result of the proceeding. *People v. Taylor*, 237 Ill. 2d 356, 375-76 (2010). I would apply that standard here and require an appellant to identify some actual, tangible, specific deficiency in counsel's performance before reversing.

---

[3]Some courts characterize this showing as one to be made in lieu of demonstrating prejudice (see *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980)), while others treat it as an alternate way to show prejudice (see *Hernandez*, 231 Ill. 2d at 143-44). Whatever the exact nature of the showing, identifying a specific deficiency in counsel's performance is analogous to showing prejudice and strikes a more appropriate balance between a respondent's right to counsel and a minor's interest in finality.

The majority's response to this dissent proves too much.[4] It posits that "[w]hen a *per se* conflict is recognized, it should immediately be brought to the trial court's attention to be remedied, either by having the party waive the conflict or by discharging the attorney." Slip op. at 7-8. By the time the conflict is recognized, however, it is too late to remedy it (unless the party waives the conflict, a prospect upon which one cannot depend). In such a case, even if the trial court were to immediately discharge the conflicted attorney, the *per se* rule would allow a party to successfully raise this issue on appeal, for it holds that, once a conflict arises, we are not allowed to inquire into its severity. The trial court may as well start over. On appeal, we will not be able to consider things like whether the attorney was involved in the case for only a short time and promptly acted to be removed from the case once the conflict became apparent. The majority's suggestion to the contrary notwithstanding, discharging a conflicted attorney is no remedy unless we can consider the nature and extent of the attorney's representation.

The majority sets up a straw man, asking, "[w]hich system makes *** waste [of the resources of the parties and the court] less likely to occur: one that prevents the potential of conflict by 'inform[ing] the trial court not to accept an appearance from an attorney who already, at some point during the proceedings, appeared on behalf of another party' (*Darius G.*, slip op. at 16), or one that waits until *after* the improper representation occurs, then requires, at best, the opportunity for a hearing to determine if prejudice has occurred, and, if it has, requires the appointment of new counsel and a new termination proceeding?" (Emphasis in original.) Slip op. at 5. The question is not which

---

[4]The majority's assertion that this dissent is not supported by authority is simply puzzling, as this dissent is expressly based on three Illinois cases: *In re D.B.*, 246 Ill. App. 3d 484, *In re C.C.*, 368 Ill. App. 3d 744, and *In re Kenneth F.*, 332 Ill. App. 3d 674.

is the better practice. I wholeheartedly agree that trial courts should strive to ensure conflict-free representation for all parties, and I trust that courts and counsel will conscientiously seek to follow the ethical rules regarding conflicts (see, *e.g.*, Ill. S. Ct. Rs. of Prof. Conduct, R. 1.7(a)(1) (eff. Jan. 1, 2010)) regardless of whether the *per se* rule is in place. Rather, the issue is what should happen when a mistake is made and a conflict arises. The majority holds that in all such cases, regardless of whether anyone suffered any prejudice whatsoever or whether the conflict had any effect upon the proceedings at all, we must undo the results of a termination proceeding. I, conversely, would closely examine the facts and circumstances of each such case before ordering that the proceedings must begin anew.

The majority further chides that this dissent does not "address how such a showing should be made." Slip op. at 5. It then goes on to pose a plethora of questions regarding subjects as esoteric as whether a trial judge will have to "recuse himself or herself" to avoid an appearance of impropriety after the disclosure of privileged information and what contempt power a trial court should use to allow the parties to present evidence. Slip op. at 6. It is generally improper for a court to give legal advice regarding future events. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 266 (2010). Addressing the many varied questions asked by the majority might run afoul of this principle. That said, as explained above, the requirement that a litigant show an actual conflict of interest that adversely affected counsel's performance is not something foreign to the law. See, *e.g.*, *Taylor*, 237 Ill. 2d at 375-76. These principles do not reflect a particularly recent development, having been articulated over 30 years ago by the Supreme Court in *Cuyler*, 446 U.S. at 350. As this body of law has been in existence for a considerable period, trial courts likely have adequate guidance regarding how to handle such matters. Furthermore, it is noteworthy that, when the Supreme Court announced *Cuyler*, it nowhere provided the detailed blueprint the majority now demands. See also *People v.*

*Krankel*, 102 Ill. 2d 181, 189 (1984) (announcing a new rule requiring what would come to be known as a *Krankel* hearing whereby a case is remanded for a posttrial hearing on a *pro se* ineffective-assistance-of-counsel claim, without providing detailed directions on how to conduct such a hearing). I further observe that the majority raises these questions in the context of considering whether the *per se* rule causes a relative waste of resources of the court and the parties. I would point out that mitigating such a waste is but one benefit of requiring a showing of prejudice, and a collateral one at that. Of primary concern is permanency and stability in the lives of the children involved in termination proceedings. See *In re Kenneth F.*, 332 Ill. App. 3d at 679-80.

Ironically, the majority, invoking Occam's razor, charges that the dissent fails "to set forth the pluralities that would arise in attempting to determine if a prejudicial violation occurred." Slip op. at 7. It then extols the virtue of the *per se* rule as a "simple explanation of how to resolve this recurring problem." Slip op. at 7. Presumably, the "recurring problem" to which the majority refers is counsel operating under a conflict of interest. Here, it is the majority that ignores perhaps the most relevant "plurality" in this case. The *per se* rule certainly provides staunch protection for a party's right to counsel; however, that is not the only interest at stake here. As noted above, stability in the life of a child is also an important consideration. By mandating reversal for even technical and *de minimis* violations of the right to counsel, the *per se* rule hardly recognizes the competing interest in stability and finality at all.

In sum, I would reject the *per se* standard in the present context just as the *In re C.C.* court declined to presume prejudice in termination cases. See *In re C.C.*, 368 Ill. App. 3d at 746-47. Instead, I would apply the long-standing principles used to assess actual conflicts of interest in criminal cases. See *Cuyler*, 446 U.S. at 350; *Hernandez,* 231 Ill. 2d at 144.