# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Tamera W.*, 2012 IL App (2d) 111131

---

| | |
|---|---|
| Appellate Court Caption | *In re* TAMERA W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Sawley W., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-11-1131 |
| Filed | March 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order finding that respondent was unfit and terminating his parental rights was not against the manifest weight of the evidence, since respondent did not have to be admonished as to the consequences of his stipulation to a finding of his unfitness, no *per se* conflict of interest was presented by the fact that the minor's mother had been represented by attorneys from the same division of the Public Defender's office as the attorneys who represented respondent, and the finding that the termination of respondent's parental rights was in the child's best interests was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 08-JA-40; the Hon. Patrick L. Heaslip and the Hon. Mary Linn Green, Judges, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Nicholas O. Meyer, of Meyer & Horning, P.C., of Rockford, for appellant. |
|---|---|
| | Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Justices Burke and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1       Respondent, Sawley W., appeals from the trial court's order entered October 20, 2011, terminating his parental rights. He argues that: (1) he did not knowingly and voluntarily enter an admission to an allegation of unfitness; (2) a *per se* conflict of interest arose when he was represented by a Conflicts II attorney from the public defender's office after the minor's mother was represented by the same division of the public defender's office at a prior juvenile proceeding; and (3) the trial court's finding that termination of respondent's parental rights was in the minor's best interest was against the manifest weight of the evidence. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3       Tamera W. was born prematurely on January 3, 2008, at which time she tested positive for cocaine in her system. When Tamera was eight weeks old, the State filed a three-count neglect petition alleging, *inter alia*, that she was born with cocaine in her urine, blood, or meconium, which was not a result of medical treatment administered to the mother or infant. See 705 ILCS 405/2-3(1)(b) (West 2008). Temporary custody and guardianship were awarded to the Department of Children and Family Services (DCFS) on February 28, 2008. She was placed in foster care with her maternal grandparents.

¶ 4       On May 15, 2008, Tamera was adjudicated neglected based on her mother's factual stipulation to count II of the petition, which alleged that Tamera was neglected in that she was born with cocaine in her system. *Id.*

¶ 5       On June 12, 2008, the trial court found that respondent was Tamera's natural father. On the same day, the trial court found that respondent was "fit, but he is unable to care for the child due to the child's medical complexities." DCFS was then granted custody and guardianship, with discretion to place Tamera with a "responsible relative, in traditional foster care, or with dad."

¶ 6       At the permanency hearing on December 9, 2008, the trial court found that, due to continued illegal drug use, Tamera's mother had not made reasonable efforts toward the goal of returning home within 12 months, but that reasonable efforts had been made by DCFS, contracting agencies, and respondent. The trial court ordered short-term care with a continued goal of returning home. DCFS was given discretion to place Tamera with respondent.

¶ 7       At a hearing on June 9, 2009, Carrie Juda, a supervisor for Catholic Charities, testified that overnight visitation with respondent had been allowed during the prior six-month period. These visits caused some issues with Tamera crying and not adjusting well to the transition between her grandparents' home and respondent's home. There were also concerns about individuals who had not passed background checks babysitting and/or spending time with Tamera. Further, Juda stated that allegations had been made by Tamera's grandmother regarding respondent's possible involvement with drug activity.

¶ 8       The trial court found that neither parent had made reasonable efforts toward the goal of returning home within 12 months. The Court Appointed Special Advocates (CASA) agency was appointed as Tamera's guardian *ad litem*. The trial court also ordered visits with respondent to be supervised. The case was continued for permanency review.

¶ 9       On June 26, 2009, Dr. Nicholas O'Riordan, a licensed clinical psychologist, conducted a psychological evaluation of respondent. According to the report, respondent "presented with an almost textbook array of the symptoms of Anti-Social Personality Disorder."

¶ 10       At the permanency hearing on January 5, 2010, respondent was found to have made reasonable efforts, but not reasonable progress, toward the goal of returning home within 12 months.

¶ 11       On June 29, 2010, the trial court, Judge Patrick L. Heaslip presiding, remarked on Tamara's "complex medical condition" and found that respondent and Catholic Charities had made reasonable progress. The goal remained to return home within 12 months.

¶ 12       On December 21, 2010, the trial court, Judge Mary Linn Green presiding, held a permanency review. Amelia Hernandez, a child-welfare case manager, testified for Catholic Charities. At that time, Tamera was 2 years and 11 months old and had remained in foster care with her maternal grandparents since she was released from the hospital as a newborn in February 2008. Hernandez stated that Tamera had developmental delays. She also had an individual education plan (IEP) in place for when she started school in January 2011. Her medical needs included a low-functioning kidney, cardiology problems, and severe hearing loss in one ear. She also needed braces for her legs.

¶ 13       Hernandez testified that Tamera's mother was incarcerated. Respondent had one-hour weekly supervised visitation with Tamera. Respondent had missed 7 out of the 25 scheduled visits. Hernandez thought that, during the previous six-month period, respondent had missed 12 of the scheduled visits, and, therefore, missing 7 visits showed improvement.

¶ 14       Other services required of respondent were random drug screenings, psychological counseling, sign language classes, and counseling with Catholic Charities. Respondent was also required to maintain stable employment and to refrain from criminal activity. His drug screens were all negative; he was discharged from psychological counseling; he had stopped

attending the sign language classes; and he had attended five counseling sessions with Catholic Charities. Hernandez stated that Catholic Charities had difficulty finding a counselor to work with respondent due to his psychological diagnosis. After six attempts, the seventh counselor agreed to counseling, but respondent attended only one session and then missed four. As a result, respondent was discharged. After that, respondent did attend five sessions with another counselor in the agency.

¶ 15 Hernandez testified that she received five paycheck stubs from respondent in six months, "so that doesn't count for the whole six months." On cross-examination, Hernandez stated that respondent was working temporary jobs. During the prior six months, respondent had been arrested for driving on a suspended license and for possession of marijuana. Hernandez opined that respondent would not be able to meet Tamera's special needs.

¶ 16 Respondent testified that he had missed seven visits with Tamera in the previous six months because he was working for a temporary service and that he had stopped working on Thursdays because of the conflict between work and visitation with Tamera. He stated that he was arrested during the prior six months but not yet convicted.

¶ 17 He stated that he quit the sign language classes because they were "too hard and too advanced." Instead, for about two months he had been studying sign language from library books. At the time of the hearing, he had not developed an ability to sign. He was aware that Tamera had special needs but he was not able to list her medications, and he was unaware that she needed leg braces. He stated that Tamera's needs were "not that far out there." He also stated that he could take care of Tamera, but if he "[fell] short" his ex-wife was a nurse and "the lady that I'm staying with currently *** takes care of old people" so they could "teach [him] what to do." He explained that he was not given any information about Tamera's doctors' appointments.

¶ 18 Respondent had unsupervised visitation with two of his other five children every other weekend and all holidays. They attended every other visit with Tamera.

¶ 19 Hernandez was recalled and testified that she provided respondent with a list of Tamera's healthcare providers and that he was invited to attend her medical appointments.

¶ 20 Both parents were found not to have made reasonable efforts or progress. The trial court further found that it was in Tamera's best interest to change the permanency goal to substitute care.

¶ 21 On February 2, 2011, the State filed a "Motion for Termination of Parental Rights and Power to Consent to Adoption," alleging in three counts that respondent was unfit. On April 2, 2011, the State filed its "Amended Motion for Termination of Parental Rights and Power to Consent to Adoption," adding count IV alleging that respondent was "depraved."

¶ 22 On April 13, 2011, an unfitness hearing commenced with Assistant Public Defender Zalud from the Conflicts II division of the public defender's office representing respondent. The State disclosed that, in a proceeding in 2001, a Conflicts II division attorney had previously represented the interest of Tamera's mother, who was then a minor in a juvenile case that was closed in 2003. The trial court then questioned the assistant public defenders who were present in the courtroom regarding any knowledge on their part of the prior case. The trial court determined that no conflict of interest existed.

¶ 23    The hearing then proceeded on the amended petition for termination of parental rights and power to consent to adoption. The State declared that if the case proceeded to hearing it "would present evidence based on clear and convincing evidence regarding depravity." This assertion was based on a certified copy of respondent's felony conviction in Cook County in March 1989. Additionally, the State proferred certified copies of two felony convictions in Winnebago County, the later of which was entered February 22, 2011. Assistant Public Defender Zalud then entered respondent's stipulation to the facts alleged in count IV of the amended petition.[1]

¶ 24    On September 15, 2011, a best-interest hearing was held at which respondent testified.[2] Respondent stated that he had completed substance abuse treatment, a parenting class, and an anger management class and was still attending Resource Intervention Center classes, which involved "cognitive behavior change." He also stated that he was unaware that only Tamera's grandfather would be adopting her; he explained that previously he had problems with her grandmother so he had missed some visits with Tamera. Respondent admitted that he had a "significant criminal background." He also had five other children, two of whom, an 11-year-old girl and a 7-year-old boy, visited him every other weekend and some holidays. He also stated that Tamera did not have a relationship with her siblings, but that this was something he would facilitate if he had custody.

¶ 25    On cross-examination, respondent admitted that he had been convicted of: solicitation of a sexual act; knowingly damaging property; domestic battery; two violations of the Illinois Controlled Substances Act, one in 2003 and one in 2011; and "numerous" counts of driving without a valid license. Additionally, he had been convicted of interfering with the reporting of domestic violence, although he could not recall that conviction.

¶ 26    On October 20, 2011, the trial court ordered that it was in the minor's best interest that respondent's parental rights be terminated and that the permanency goal be changed to adoption. Further proceedings were stayed pending an appeal, and a permanency review was set for April 10, 2012.

¶ 27    Respondent timely appealed and now requests a reversal of the best-interest finding and a remand for a new unfitness hearing.

¶ 28                                    II. ANALYSIS

¶ 29    Respondent first contends that his stipulation to unfitness was unknowing and involuntary because he was not admonished in a manner analogous to Illinois Supreme Court Rule 402 (eff. July 1, 1997), which governs guilty pleas in criminal proceedings. This argument was procedurally defaulted because respondent failed to raise this issue in the trial court. See *In re M.W.*, 232 Ill. 2d 408, 430 (2009) (a respondent's failure to object at trial forfeits consideration of the claimed error on appeal unless the respondent can demonstrate

---

[1]The trial court found Tamera's mother unfit based on her stipulation to one count of the amended petition for termination.

[2]At the hearing on this date, Tamera's mother executed in open court a consent to adopt.

plain error).

¶ 30 Although respondent did not raise this issue before the trial court, forfeiture is a limitation on the parties, not the reviewing court, and we will relax the forfeiture rule to address a plain error affecting the fundamental fairness of a proceeding, maintain a uniform body of precedent, and reach a just result. *In re Darius G.*, 406 Ill. App. 3d 727, 732 (2010). The termination of parental rights affects a fundamental liberty interest. *In re J.J.*, 201 Ill. 2d 236, 243 (2002). Accordingly, we will consider whether respondent was denied due process in these proceedings. We review *de novo* legal questions regarding supreme court rule compliance. *People v. Williams*, 344 Ill. App. 3d 334, 338 (2003).

¶ 31 Rule 402, governing "Pleas of Guilty or Stipulations Sufficient to Convict," provides in its entirety:

"In hearings on pleas of guilty, or in any case in which the defense offers to stipulate that the evidence is sufficient to convict, there must be substantial compliance with the following:

(a) Admonitions to Defendant. The court shall not accept a plea of guilty or a stipulation that the evidence is sufficient to convict without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences;

(3) that the defendant has the right to plead not guilty, or to persist in that plea if it has already been made, or to plead guilty; and

(4) that if he pleads guilty there will not be a trial of any kind, so that by pleading guilty he waives the right to a trial by jury and the right to be confronted with the witnesses against him; or that by stipulating the evidence is sufficient to convict, he waives the right to a trial by jury and the right to be confronted with any witnesses against him who have not testified.

(b) Determining Whether the Plea is Voluntary. The court shall not accept a plea of guilty without first determining that the plea is voluntary. If the tendered plea is the result of a plea agreement, the agreement shall be stated in open court. The court, by questioning the defendant personally in open court, shall confirm the terms of the plea agreement, or that there is no agreement, and shall determine whether any force or threats or any promises, apart from a plea agreement, were used to obtain the plea.

(c) Determining Factual Basis for Plea. The court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." Ill. S. Ct. R. 402 (eff. July 1, 1997).

The committee comments indicate that Rule 402 was revised in accordance with *Boykin v. Alabama*, 395 U.S. 238 (1969), where the record of the defendant's plea hearing showed that the trial court asked the defendant no questions concerning his plea and the defendant did not

address the court. The Supreme Court held that, for a guilty plea to be valid under the due process clause, the record must affirmatively show that the plea was entered intelligently and with full knowledge of its consequences. *Id.* at 242. The committee comments state that "[t]wo major objectives of new Rule 402 are: (1) to insure compliance with the *Boykin* requirements; and (2) to give visibility to the plea-agreement process and thus provide the reviewing court with a record containing an accurate and complete account of all relevant circumstances surrounding the guilty plea." Ill. S. Ct. R. 402, Committee Comments (rev. May 1997).

¶ 32    Regarding parental unfitness, the Illinois Supreme Court has held that due process requires a trial court to determine whether a factual basis exists for an admission of parental unfitness before it accepts an admission. *In re M.H.*, 196 Ill. 2d 356, 368 (2001). This factual basis requirement furthers the State's and the parent's interest in a correct and just decision at the fact-finding proceeding. *Id.* at 367. The test safeguards against an erroneous deprivation of a parent's fundamental right to parent his or her children, without imposing any increased burden on the State. *Id.* at 368.

¶ 33    In this case, respondent contends that the admonishment requirements of Rules 402(a) and (b) should apply to termination proceedings. Respondent relies on *M.H.*, 196 Ill. 2d at 367, and *In re J.P.*, 316 Ill. App. 3d 652 (2000), for this proposition. Acknowledging that neither case specifically addressed whether due process at a termination hearing requires compliance with Rules 402(a) and (b), respondent argues that "[a] fair reading of [*M.H.* and *J.P.*] indicates that the courts intended to apply those requirements to parental termination cases, especially in light of the courts' emphasis on requiring that an admission be made knowingly and voluntarily."

¶ 34    We disagree. We do not infer from either *M.H.* or *J.P.* an intention to require a respondent to be admonished by the trial court regarding the consequences of his admission or to require the trial court to inquire regarding the voluntariness of his admission. In Rule 402, the Illinois Supreme Court specifically set forth the requirements for a voluntary and knowing admission in a *criminal* proceeding. We decline to expand the holdings of *M.H.* and *J.P.* to impose greater strictures regarding admonishments in a termination-of-parental-rights proceeding.

¶ 35    Respondent next contends that a *per se* conflict of interest existed because the Conflicts II division of the public defender's office had previously represented Tamera's mother in a 2001 abuse and neglect case in juvenile court, and respondent's attorneys in this proceeding were also from the Conflicts II division. Whether an attorney's representation constituted a *per se* conflict of interest is an issue of law that we review *de novo*. *Darius G.*, 406 Ill. App. 3d at 732.

¶ 36    This court has held that a *per se* conflict of interest, requiring reversal of a termination of parental rights, arose when the same attorney appeared on behalf of both the respondent mother and the minor at different times during the same proceeding. *Id.* In *Darius G.*, we propounded a "clear rule" that "the *same* attorney may not during the proceedings appear on behalf of *different* clients." (Emphases in original.) *Id.* at 738. In such a situation, "[p]rejudice is presumed and respondent need not demonstrate that the conflict contributed

to the judgments entered against her." *Id.* at 739. Relying on *Darius G.*, this court, in *In re Paul L.F.*, 408 Ill. App. 3d 862, 865 (2011), reversed the trial court's judgment finding the respondent to be unfit. There, the respondent was represented by 10 different attorneys throughout the course of the proceedings in the trial court. Two of those attorneys represented other parties at various times during the proceedings. We stated that "the termination of parental rights is a drastic measure, and the strict procedural requirements adopted to regulate such proceedings 'are paramount.' " *Id.* (quoting *Darius G.*, 406 Ill. App. 3d at 739). Therefore, prejudice was presumed in the "unacceptable rotation of representation," and reversal was mandated. *Id.*

¶ 37        "The *per se* rule, if properly followed, prevents attorneys from being placed in the untenable and potentially unethical position of having their loyalties divided by representing multiple parties in the same proceedings." *In re Quadaysha C.*, 409 Ill. App. 3d 1020, 1023 (2011). *Quadaysha C.* stands for the proposition that representation of more than one client by an attorney invokes the *per se* rule set forth in *Darius G.* The rule requires no showing of prejudice; rather, in such a situation, prejudice is presumed.

¶ 38        As the State points out, respondent is attempting to expand the *per se* rule further to proscribe representation by different attorneys employed by the same office, or division of an office. However, in ruling on the issue of representation of one client by different attorneys from the office of the public defender, the Illinois Supreme Court has stated:

        "Public defender's offices *** are unlike private law firms for purposes of conflicts of interest. While a conflict of interest among any member of a private law firm will disqualify the entire firm [citation], the disqualification of an assistant public defender will not necessarily disqualify all members of that office [citation]." *People v. Banks*, 121 Ill. 2d 36, 41 (1987).

¶ 39        The discussion of this issue in *People v. Vaughn*, 200 Ill. App. 3d 765 (1990), in the context of one assistant public defender asserting ineffective assistance of counsel on the part of another assistant public defender, is instructive. The *Vaughn* court noted that *Banks* did not hold that there could *never* be a conflict of interest within the public defender's office; rather, a case-by-case inquiry should be conducted by the trial court to determine if any special circumstances indicate the existence of a conflict. *Id.* at 770. The inquiry is twofold: first, the trial court must determine whether a *per se* conflict exists, so as to preclude representation; second, if no *per se* conflict exists, the defendant must show the existence of an actual conflict and actual prejudice resulting from the appointed attorney's representation. *Id.* at 770; see also *People v. Smith*, 176 Ill. App. 3d 132, 139 (1988) ("[A] *per se* disqualification is based on the invalid presumption that public defenders are unable to subordinate office allegiances to the foremost obligation owed to their clients.").

¶ 40        Here, the Conflicts II unit of the public defender's office represented the mother in a previous juvenile proceeding that was closed in 2003. The same unit was appointed to represent respondent on February 28, 2008. The record establishes that three different attorneys with the unit represented respondent in succession for the remainder of the proceeding. The record also contains the April 13, 2011, statements of the assistant State's Attorney who had supervised the juvenile unit for over 12 years. She stated that she

recognized "the names from a 2001 case where the mother was the minor in an abuse/neglect case" and wanted to inform the court of the situation. She further stated that "none of the attorneys that were around in the 2001 case are in this courtroom at this point. That case was closed in 2003. None of the attorneys *** in the 2001 case ever appeared in this 2008 case." The court then questioned each of the three assistant public defenders present in court representing the mother, CASA, and respondent, regarding their knowledge of, or involvement with, the prior case. Each attorney answered that he or she had no knowledge of the earlier case.

¶ 41 Here, several different attorneys from the Conflicts II unit represented respondent in succession, none of whom had any knowledge of or involvement with the prior juvenile court case involving the mother. The trial court carefully addressed each attorney from the public defender's office present in court and established that he or she had no knowledge of or involvement with the prior case. In this manner, the requirements of *Banks* were followed. We conclude that no *per se* conflict of interest is presented.

¶ 42 Citing *People v. Fields*, 409 Ill. App. 3d 398 (2011), respondent focuses on the concept of "undivided loyalty" as a basis for finding a *per se* conflict of interest. This "undivided loyalty" rationale arises when an attorney represents a party in one proceeding whose interests are opposed to his client's in a second proceeding, and a verdict against the latter would be favorable for the first party. However, we agree with the State that the situation in this case is not analogous. In the prior proceeding, the Conflicts II unit represented the mother's interest as a ward of the court. Here, she is a parent relinquishing her parental rights to the minor. There is no direct relationship between either her wardship or her voluntary relinquishment of rights and respondent's representation in this case.

¶ 43 Finally, respondent contends that the trial court's finding, that it was in Tamara's best interest that respondent's parental rights be terminated, was against the manifest weight of the evidence. The constitutionally proper standard at a best-interest hearing is proof by a preponderance of the evidence, which adequately ensures the level of certainty about the court's factual conclusions necessary to satisfy due process. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Our standard of review of the trial court's decision is whether the findings were contrary to the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 892 (2004).

¶ 44 In the context of a best-interest determination, section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2008)) sets forth a number of factors to consider within "the context of the child's age and developmental needs." The factors include the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued ***;

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 45    The record establishes that Tamera was born on January 3, 2008, with cocaine in her system. At eight weeks of age, she was adjudicated neglected and placed with her maternal grandparents. She was six months old when the court determined that respondent was her natural father. At the time of this proceeding, in October 2011, when respondent's parental rights were terminated, she was almost four years old. She had spent her entire life in the care of her maternal grandparents, and further, she had significant medical and special educational needs. Although her grandparents were in the process of a divorce, her grandfather was willing and able to adopt her and meet her educational and medical needs.

¶ 46    Respondent avers that Tamera has five half-siblings with whom she would be allowed to visit if she were placed with respondent; he is aware that Tamera has medical needs and he has attended all doctors' appointments of which he was aware; from February 2008 through September 2011, he regularly visited with Tamera; and he completed all services that were required of him. Further, respondent points out that, while Tamera is currently placed in foster care with her step-grandfather, he is not a blood relative; Tamera and respondent are African-American, while her step-grandfather is white, and Tamera recognizes respondent as her father. Respondent contends that these factors weigh in his favor and that the State failed to prove by a preponderance of the evidence that terminating respondent's parental rights was in Tamera's best interest.

¶ 47    However, we are guided by the Illinois Supreme Court in *In re C.W.*, 199 Ill. 2d 198, 217 (2002), which stated, "at the second stage of the termination hearing, at which the court considers whether it is in the best interest of the minor that parental rights be terminated," "the full range of the parent's conduct can be considered." Further, in *In re D.L.*, 191 Ill. 2d 1, 12-13 (2000), the Illinois Supreme Court held that, where the parent was found unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2008)), evidence of the parent's more recent conduct occurring outside the relevant statutory period may be introduced at the best-interest hearing. In this case, the evidence clearly proved that respondent would not be able to provide Tamera with a stable home environment or the resources necessary to address her special needs. The termination of his parental rights was not against the manifest weight of the evidence.

¶ 48                        III. CONCLUSION

¶ 49    The trial court's decision finding respondent unfit and terminating his parental rights was not against the manifest weight of the evidence. Accordingly, the judgment of the circuit court of Winnebago County is affirmed.

¶ 50    Affirmed.