2024 IL App (2d) 240096-U
Nos. 2-24-0096, 2-24-0103, 2-24-0104, 2-24-0105, & 2-24-0106 cons.
Order filed July 8, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | |
|---|---|
| *In re* A.D., T.D., M.D., C.D., and I.D., Minors ) | Appeal from the Circuit Court |
| ) | of Kane County. |
| ) | |
| ) | Nos. 21-JA-098 |
| ) | 21-JA-099 |
| ) | 21-JA-100 |
| ) | 21-JA-101 |
| ) | 22-JA-089 |
| ) | |
| (The People of the State of Illinois, Petitioner- ) | Honorable |
| Appellee, v. Christina D., Respondent- ) | Kathryn D. Karayannis, |
| Appellant). ) | Judge, Presiding. |

_____

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment

**ORDER**

¶ 1   *Held*:   The trial court did not err in finding that the termination of respondent's parental rights was in the best interest of the children where the evidence showed that respondent prioritized husband's criminal defense over completion of services, the children were bonded with their foster parents, and would benefit from a permanent placement. Affirmed.

¶ 2   Respondent Christina D. (Crissy) appeals the trial court's finding that the termination of her parental rights was in her minor children's best interest. For the following reasons we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4      Christopher D. (Chris) and Crissy had five children together: A.D., born March 16, 2012; T.D., born October 21, 2015; M.D., October 2, 2016; C.D., born June 3, 2019; and I.D., who was born on June 21, 2022, during the pendency of her siblings' cases.

¶ 5      On June 30, 2021, following a domestic disturbance which occurred on June 11, 2021, the State filed neglect petitions on behalf of A.D., T.D., M.D., and C.D. The petitions alleged that the children were neglected in that the parents did not provide the proper or necessary support, education, medical care, or other care necessary for their wellbeing and that their environment was injurious to their welfare, pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(a), (b) (West 2020)). Specifically, the petitions alleged that the condition of the family's home was unsanitary and that there were drugs and weapons in the home accessible to the children. Further, the petitions alleged that Chris's mental health issues and history of domestic violence placed the children at risk and that Crissy failed to protect the children from the risk he posed.

¶ 6      A shelter care hearing was held on July 1, 2021. At that time Chris's criminal defense attorney, Francis Baumgart, asked to represent both Chris and Crissy. Concerned that there may be a conflict, the trial court stated that it would not allow Baumgart to represent them both. Baumgart then requested to represent Crissy, but the trial court, still concerned about conflicts, stated that it would allow Baumgart to represent Chris, but not Crissy. The public defender's office was appointed to represent Crissy until she could retain private counsel.

¶ 7      At the shelter care hearing, a sworn police synopsis regarding the June 11, 2021, incident was admitted into evidence. According to the synopsis, police responded to a domestic disturbance at the family's home in Elgin. A witness reported that Chris and Crissy were having an argument,

and that Chris then poured gasoline onto Crissy's SUV, which was parked in the driveway near the front of the house. Chris then entered the home and returned with a burning piece of paper he used to try and ignite the gasoline. He was thwarted when Crissy began hosing down the area and paper with a garden hose. When the police arrived, Crissy was outside and reported that Chris was inside with two of the children. A live .40-millimeter bullet was found on the front porch. Chris was then apprehended alone several blocks away, and police entered the home to locate the other two children. Police also located a 40-millimeter Smith and Wesson handgun approximately 75 feet behind the residence in a wooded area. A search warrant was obtained for the home, and police located ammunition and magazines for a Smith and Wesson .40-millimeter handgun, two different caliber bullets, nine kilograms of cannabis plants, and drug manufacturing equipment. Based on the unsanitary condition of the home, the City of Elgin condemned the residence.

¶ 8    As a result of the June 11, 2021, incident, he was charged with armed violence, manufacture or delivery of cannabis more than 5000 grams, possession of cannabis more than 5000 grams, unlawful use of possession of weapons or ammunition by a convicted felon, and attempt arson. At the time of the domestic disturbance, Chris was on probation for a prior incident that occurred on February 4, 2020, in which Chris was charged with domestic battery against Crissy, her mother, Madge F., and Crissy's adult son from a prior relationship. Chris pled guilty to the charges against Crissy's mother. Chris ultimately served time in the Illinois Department of Corrections for violating the terms of his probation. He completed his sentence prior to the conclusion of the instant case.

¶ 9    An adjudicatory hearing was held on September 28, 2021. At that hearing Chris and Crissy agreed to stipulate to the allegations contained in count 3.5 of the State's petition, which alleged that the children were neglected in that their environment was injurious to their welfare because

Chris's mental health placed the children at risk and Crissy failed to protect them from him. In exchange, the State agreed to withdraw the other counts with the understanding that the integrated assessment may still require participation in services related to the withdrawn counts. The factual basis presented was that Chris was treated inpatient at Amita Health in June 2021 and was diagnosed with major depressive disorder and bipolar disorder with a self-reported history of post traumatic stress disorder.

¶ 10     Following the integrated assessment, a service plan was created in October 2021. The plan required Chris to participate in the following services: (1) cooperate with DCFS; (2) maintain safe, adequate, and clean housing; (3) participate in a mental health evaluation and psychiatric evaluation and to comply with recommended treatment through individual therapy; (4) refrain from criminal conduct; (5) refrain from using drugs and alcohol and undergo a substance abuse assessment; (6) participate in a domestic violence consultation and comply with recommendations; (7) participate in family therapy when therapeutically appropriate; and (8) attend parenting education and coaching.

¶ 11     The plan required Crissy to participate in the following services: (1) cooperate with DCFS; (2) maintain safe, adequate, and clean housing; (3) participate in a domestic violence consultation and comply with recommendations; (4) participate in family therapy when therapeutically appropriate; (5) participate in parent education and coaching; (6) participate in a mental health evaluation and comply with recommended treatment through individual therapy.

¶ 12     A dispositional hearing was held on November 30, 2021. The following were submitted as evidence: the guardian *ad litem*'s report, the DCFS report, the therapy assessment and treatment plans for three of the children, the integrated assessment, photographs of the condition of the home when the police entered on June 11, 2021, Chris's health records, police body camera videos, the

police sworn synopsis, statement's showing Chris's non-compliance with his bond conditions, and the transcript of the suppression motion in Chris's criminal case.

¶ 13    One of the body camera videos showed a member of the SWAT team entering the home. The front door was locked on the inside with a chain bolt such that the officers had to use a battering ram to break the lock. As the officers entered, one slipped on the entryway floor. The officer remarked that he was not sure if the floor was slick with water or gasoline. The home was in complete disarray, with food, garbage, clothing, and toys strewn about the floor. Most of the furniture was overturned or broken. Officers located a gas can sitting on the kitchen table. The officers also located A.D. trapped in a bathroom on the first floor with the doorknob broken off. The officers were forced to batter the door open to free him. There was a room on the first floor filled with items such that there was no space on the floor to walk. The laundry room was similarly filled with clothes. The garage was filled with old garbage, and flies are visible in the footage. Upstairs was a Peloton stationary bike with a smashed screen. There were holes punched in the double doors leading to the master bedroom. Inside the bedroom were two boxsprings and three mattresses stacked in a haphazard pile with no sheets. The double doors to the master bathroom were torn down and lying in the bathroom. It also appeared the windows had previously been covered by some kind of sheet or curtain that was torn down, as the ripped remnants remained above the window frames. The door to the basement was locked with a padlock. In the basement was a pile of children's toys and other items. Further back the officers discovered what they described as a marijuana grow operation.

¶ 14    The trial court determined that Chris and Crissy were both unfit and unable to care for, protect, train, educate, supervise, or discipline the children; that reasonable efforts and appropriate services could not prevent or eliminate the necessity for removal of the children from the home;

and that leaving the children in the home was contrary to the health, welfare, and safety of the children. The trial court made the children wards of the court and set a permanency goal of return home in 12 months. The court also admonished both Chris and Crissy that should they choose to remain together, they would "rise and fall together" meaning that the court would not return the children to a home where one parent had made progress but the other had not.

¶ 15    A guardian *ad litem* report dated June 12, 2022, indicated that Chris and Crissy were living together in Elgin. It also indicated that, following a visit on May 21, 2022, A.D. told M.D. that he had a "family secret" that Crissy would be having a baby in two weeks.

¶ 16    On June 24, 2022, the State filed a neglect petition on behalf of the newborn I.D. The petition alleged the minor was neglected in that the parents did not provide the proper or necessary support, education, medical care, or other care for her well-being and that her environment was injurious to her welfare. Specifically, the petition alleged the environment was injurious in that drugs and weapons were present in the home and accessible to the minor, that Chris's mental health and domestic violence issues placed the minor at risk, and that Crissy failed to protect I.D. from Chris.

¶ 17    A shelter care hearing was held that same day. DCFS Investigator Christina Reese and DCFS caseworker Tina Varney testified at the shelter care hearing that the parents had not told DCFS that Crissy was pregnant. When the parents were asked, they confirmed that Crissy was pregnant but would not give any details regarding her expected due date or which hospital Crissy intended to have the baby at. When Reese later learned that the child may have been born, she attempted to reach out to Chris and Crissy, Crissy's mother, and the parties' attorneys, but received no information. Reese eventually learned from calling local hospitals that Crissy had been released from Lutheran General Hospital on June 22, 2022. Chris and Crissy had informed the other

children about the pregnancy saying it was a "family secret" and that they did not want the baby taken by DCFS from the hospital. One of the children told their foster parents, who then told Varney. Neither Reese nor Varney knew where the newborn child currently was. Varney expressed concern about I.D. remaining in the parent's care, as she felt that neither of them had made much progress in their respective therapies. The trial court ordered that I.D. be placed in shelter care and granted temporary custody to DCFS.

¶ 18    June 24, 2022, was also to be the day of the first permanency review for the other four children, however, when the court asked the attorneys if they were ready to proceed, Chris's counsel, Baumgart, answered that he was not prepared to proceed, stating, "I know nothing or next to nothing about the negligence [*sic*] court. I am a criminal attorney. And we were going to allow Crissy's attorney to take the lead, and they have not been able to retain one." The trial court then appointed conflict counsel for Chris who represented him at the shelter care hearing for I.D. and throughout the rest of the case before the trial court.

¶ 19    The permanency hearing was postponed until June 30, 2022. At that time the State asked the court to find that neither Chris nor Crissy had made reasonable efforts or progress but that the goal should remain to return home. The State expressed concern that both parents had reported that they had not participated in certain services, allegedly based on representations by Baumgart that they did not need to do so. However, the State was confident that both parents now had able counsel who were familiar with child protection cases. The guardian *ad litem* concurred with the State's recommendation, stating that they were originally going to recommend a change in permanency goals but were concerned with how Baumgart's representation might lead to a reversal on appeal should the case proceed to termination.

¶ 20    Crissy's counsel advised the court that Baumgart had advised the parents not to cooperate

with some of the services because of the pending criminal charges against Chris. She now believed that Crissy understood that cooperation with DCFS was necessary to achieve the ultimate goal of returning the children to her care, and that she was now on the right track.

¶ 21    The trial court agreed with the State's and guardian *ad litem*'s recommendations and set the goal of return home in twelve months, finding that although the parents had made some efforts, there had not been reasonable or substantial progress. The trial court expressed that it had the same concerns regarding the advice the parents had received from Baumgart but had no quarrel with current counsel's ability to represent the parents, stating, "[s]o it is for that reason and that reason alone, essentially, right now, that I am going to leave the goal at return home 12 [months]."

¶ 22    An adjudicatory hearing for I.D. was held on September 15, 2022. At the hearing, Chris and Crissy stipulated that the State's evidence would show that I.D. was neglected in that her environment was injurious to her welfare based on Chris's mental health and the parents' failure to fully cooperate with or to make progress in recommended services. In exchange the State withdrew the remaining counts with the understanding that, based on the integrated assessment, DCFS still could require the parents to participate in services related to all withdrawn counts. The factual basis for the claim was that Chris had been diagnosed with major depressive disorder and bipolar disorder, and that he self-reported a history of PTSD. Both parents had open DCFS cases with I.D.'s siblings where they had been found unfit and not progressed enough in services to be restored to fitness.

¶ 23    Chris chose not to participate in an integrated assessment in I.D.'s case, claiming he wanted a lawyer present. Crissy's integrated assessment indicated that the primary concerns were "minimization, avoidance, and denial[.]" The assessment reported that Crissy was placing the needs of herself and Chris above those of the children. The assessment recommended that Crissy

complete a psychological evaluation.

¶ 24    On October 21, 2022, the trial court entered a dispositional order, finding that both Chris and Crissy were unfit and making I.D. a ward of the court in DCFS's custody.

¶ 25    The trial court twice reserved the permanency goals in part to allow Crissy time to complete a psychological evaluation. In a report dated March 8, 2023, Mary Gardner diagnosed Crissy with other specified personality disorder with narcissistic features. The report stated in part that, "[Crissy] is intensely motivated to portray herself and her life in superlative ways. When pressed, she can supply an outline of the actual circumstances but denies any part of it to be true. She is so motivated to do that that she significantly distorts circumstances and can break with reality at times." The report further stated,

> "Crissy tends to significantly distort events going on around her. This appears to be due to a desire to maintain a lofty and grandiose sense of herself. When faced with incidents that she feels are derogatory about her, she is apt to deny and misperceive what is occurring. This would be very dysfunctional to a caretaking role, as she would theoretically transfer any negative occurrence into a positive one, and thus deny any problem area related to her children."

Gardner's report recommended that Crissy complete a parenting capacity assessment.

¶ 26    A permanency hearing was held on April 21, 2023. At that hearing both the State and GAL requested that the goal be changed to substitute care pending termination. DCFS recommended that the goal should not be changed until Crissy had an opportunity to complete the parenting capacity assessment. The trial court agreed that the goal should be changed to substitute care pending  determination of termination of parental rights. The trial court found that neither Chris nor Crissy had made reasonable efforts or reasonable and substantial progress.

¶ 27    On October 13, 2023, the State filed petitions to terminate parental rights in each of the children's cases. The petitions alleged that Chris and Crissy were unfit in that they failed to: (1) maintain a reasonable degree of interest, concern, or responsibility (750 ILCS 50/1(D)(b) (West 2022)); (2) protect the minors from conditions within their environment injurious to their welfare (*id.* § 1(D)(g)); or (3) make reasonable efforts to correct conditions that were the basis for removal or to make reasonable progress toward return during the previous three nine-month periods for the older children and in the last nine-month period in the case of I.D. (*id.* § 1(D)(m)).

¶ 28    The parental fitness hearing was held on November 2, 3, and 30, 2023.

¶ 29    At the hearing, Chris gave limited testimony via Zoom before invoking his fifth amendment right against self-incrimination and refusing to answer additional questions. Chris testified that he and Crissy were married in July 2021. Chris stated that his criminal attorney, Patrick Campanelli, advised him not to testify regarding anything related to his ongoing criminal case. He refused to answer questions regarding where he lived or who he lived with in June 2021, what the state of his home was, whether he was licensed to sell marijuana, and whether there were safes located in the home.

¶ 30    He denied asking anyone for help regarding his mental health on June 11, 2021. He admitted to being taken to the hospital for a concussion and stated that he did not receive any medication following his discharge. He testified that he did not have and had never had mental health issues or needed medication for mental illness. He did not believe that the children should have been removed from his care. Chris completed a Partner Abuse Intervention Program (PAIP) assessment at Braden Counseling Center, and the result of the evaluation was that he was recommended to participate in the program. He stopped going to Braden when he was not assigned a new therapist, claiming that his therapist was lying on the reports. He then refused to answer any

further questions.

¶ 31    The trial court took note of the fact that the device or account Chris had used to log in to Zoom listed "Crissy" as the name of the participant.

¶ 32    Crissy attempted to invoke marital privilege throughout the course of the State's examination to avoid testifying. The court determined that marital privilege did not apply to her testimony, as it only extended to statements made during the course of the marriage and Chris and Crissy were not married during the incident. Crissy also sought to invoke her fifth amendment right against self-incrimination and was offered use immunity by the State. Crissy testified as follows.

¶ 33    Crissy denied that Chris was living at the home on June 11, 2021. She could not recall when he moved out or why, nor when Chris moved back in.

¶ 34    Regarding the condition of her home, she testified that she was still moving in from when they bought the house in February 2021, and that the house was clean on the date of the incident. She stated that the reason the basement door was padlocked was because the children attempted to ride their bikes down the stairs and denied that the door was locked because marijuana was being grown in the basement. When asked who was growing marijuana in the basement she said, "I don't know."

¶ 35    She testified that she and Chris had gotten into an argument on June 11, 2021, but that it did not rise to the level of domestic violence. She was outside with M.D. and T.D. when the police arrived. A.D was in the bathroom, and C.D. was sleeping in his crib. She told the police that Chris needed an evaluation. She denied that she told police Chris was breaking things in the home. She testified that Chris had thrown mason jars on the driveway. The only wrongdoing she acknowledged on June 11, 2021, were that she yelled and that Chris broke the mason jars.

¶ 36    Regarding the gasoline, Crissy testified that Chris was attempting to put gasoline in her SUV because its tank was empty and during this process he placed the gas can on the roof of the vehicle where it fell, spilling gas on the vehicle but not the driveway. She also testified that the gas can came from the backyard and was for the lawn mower. She denied knowledge of how the gas can got into the house. She eventually got a hose to clean the gas off the vehicle, and Chris went back inside while she was doing so. She denied that Chris had lit a piece of paper on fire.

¶ 37    Crissy denied that the bullet located on the porch belonged to her or Chris. She denied owning any and denied there were any guns in the house. She testified that the safes in her home were empty and that they were going to sell them. When asked who the bullet on the front porch belonged to or whether she told her therapist that the bullet on the porch belonged to the police, she refused to answer, claiming to be in fear of her safety. She stated that it was her position that the police lied about what happened on June 11, 2021.

¶ 38    Crissy did not believe that her children should have been taken into DCFS custody. She did not believe that she needed individual therapy, beyond the fact that she was traumatized by her children being removed from the home. She denied any domestic violence in her relationship with Chris. She denied that Chris had an anger problem. She testified that Chris had not been diagnosed with any mental illnesses.

¶ 39    Crissy stated that she and Chris were no longer living together and that she did not know where Chris was living, despite speaking with him during visitation. She initially claimed that they separated after I.D. was born, and then later claimed that it was before she was born. Crissy stated that she and Chris separated because she wanted to put her children first, and people were saying horrible things about Chris, though they were untrue.

¶ 40    Crissy's parenting coach, Helen Strom, testified regarding Crissy's progress with parenting

coaching. Strom noted that although Crissy completed additional sessions beyond what is typically required, Strom still had concerns regarding Crissy's ability to parent the children. Particularly, Crissy struggled to supervise and address behavioral issues for all of her children at once and failed to consistently implement the parenting skills they had worked on.

¶ 41    Nicky Poloski was Crissy's therapist at Brighter Side Counseling. She started seeing Crissy in September 2021. They had around 40 sessions together over the course of a year, which Poloski testified to as follows. Crissy denied that there was domestic violence in her relationship with Chris. Crissy maintained that the whole story from the police and DCFS was a lie, claiming they were trying to get "kickbacks." Crissy stated that the gun recovered by police was a BB gun and that the bullet recovered by police on the porch may have been dropped by a police officer when her dog jumped up on him. Crissy said that the neighbor who called the police was over a football field away and misheard her telling Chris not to smoke while putting gas in the car. Crissy told Poloski she used the hose to wash spilled gas off the car and a food mess the kids left on the porch. Crissy also said that Chris was not at the home when police arrived because he was trying to catch a dog. At one point, Crissy indicated that she disagreed with a psychological evaluation that diagnosed her husband with bi-polar disorder.

¶ 42    Several of Crissy's sessions were held remotely with Crissy calling in from locations where Chris was present. Poloski got the impression that Crissy might be in danger and that Chris was listening in. On July 5, 2022, Crissy told Poloski that although she liked her as a therapist, Crissy thought she needed a different therapist because she felt Poloski's notes would not look good in court. Poloski felt like the decision was being made at the direction of Chris. Ultimately, Crissy was unsuccessfully discharged from individual therapy.

¶ 43    Kelsey Flynn was Chris's therapist at Braden Counseling Center. She testified that she first

met with Chris in September 2021. They met for a total of nine sessions before Chris stopped showing up. During those sessions Chris would not discuss why the children were removed from his care nor take any responsibility. He mentioned that what was being said was untrue and attempted to explain the condition of the house by saying that the dog had tracked in mud. Chris also stated that he had an ongoing criminal case and refused to discuss the events of June 11, 2021, saying that his attorney had advised him not to talk about it. Ultimately, Chris was unsuccessfully discharged from treatment.

¶ 44    Dwayne Thomas was Chris's PAIP counselor at Braden Counseling Center. Thomas testified that Chris attended a PAIP evaluation on February 22, 2022, and was found to be appropriate for PAIP counseling, but refused to participate further, saying he wanted to do his PAIP counseling in Cook County. During the assessment Chris was aggravated and argumentative. Eventually, Chris had to be asked to leave.

¶ 45    Tina Varney, the family's placement caseworker from DCFS, testified as follows: Chris and Crissy had both been recommended to individual therapy along with parenting classes and coaching. Chris was also recommended for a substance abuse assessment and domestic violence consultation.

¶ 46    Apart from one occasion early on at which Chris indicated that he had mood swings, Chris never acknowledged that he had any mental health issues. He went to Braden Counseling Center for individual therapy and a domestic violence consultation, which ultimately led to a recommendation that he participate in PAIP counseling. Chris claimed that his therapist and the PAIP counselor at Braden were lying about him and stopped attending Braden.

¶ 47    Both parents completed parenting classes but were never able to move to unsupervised visits. Crissy completed parenting coaching with limited success, whereas Chris was unable to

complete parenting coaching due to his incarceration. Neither Chris nor Crissy was able to complete family therapy as it was not deemed to be therapeutically appropriate given that neither of them demonstrated that they had accepted responsibility for the reason the children were placed into DCFS's care.

¶ 48    Varney testified that the parents had inappropriate conversations regarding the children's cases. They told the children that DCFS lies and that they were fighting DCFS. They told the children they were having a baby, but that it was a family secret and not to tell DCFS. Additionally, while Chris was incarcerated, Crissy told the children that he was in quarantine, which caused the children distress as they feared for their father's health.

¶ 49    Regarding Crissy's individual therapy, she initially treated at Brighter Side Counseling before switching to Holistic Care for Women and Children in August 2022. She saw two therapists there before being transferred to another therapist for dialectical therapy, which was recommended by her psychological evaluation. She attended two dialectical therapy sessions in August 2023, and then stopped attending. Per her psychological evaluation, Crissy was recommended for a parenting capacity assessment. In March 2023, Varney recommended Crissy to Gardner, who had completed her psychological evaluation and who was approved by DCFS. Crissy indicated that she wanted to find her own provider. However, the provider Crissy selected was cost prohibitive and not willing to testify in court. Varney tried to reach out to Crissy about seeing another DCFS provider, but she received no response.

¶ 50    Additionally, officers from the Elgin police department testified regarding the condition of the home on June 11, 2021, corroborating the condition of the house depicted in the body camera footage.

¶ 51    The trial court found that the State had demonstrated Chris's and Crissy's unfitness on all

of the grounds set forth in its petitions for termination of parental rights. In making its ruling as to fitness, the trial court made the following statement regarding the credibility of the witnesses.

"So I have assessed the credibility of the witnesses and I find that all of the non-party witnesses were credible. I find that the testimony of both of the parents was informative regarding their priorities not being reunification with their children. I find that the demeanor of both of the parents should be stated for the record because the cold record will not appropriately reflect their demeanors necessarily.

I note first that when [Crissy] was called to testify in the State's case, she requested a recess. We took the recess and then she refused to turn her video back on after that recess and was ordered to come to court in person[,] which she has done since that order was in place. Her demeanor while testifying consisted of times where she was barely audible. I think the record will reflect that I repeatedly asked her to raise her voice to be heard. It was rather sheepish testimony in the Court's opinion. There were long pauses and delays before answers were given, which, again, I don't think the record would reflect necessarily.

When Sergeant Lalley was testifying, the mother was present in court pursuant to orders that she appear in person. During his testimony she pushed her chair back from the table, bent forward with her head down almost at table level. Whether she was embarrassed, afraid, or ashamed, I don't know, but I thought that that was noteworthy behavior. Her— she has got the demeanor of someone who appears to be afraid of someone or something. She says it's of the police, but had no evidence to support that. And there is no evidence in the record that would support that. In relation to her overall testimony I found it almost wholly not credible.

In relation to [Chris's] testimony, I also found his testimony wholly not credible.

He was largely emotional until Sergeant Lalley began to testify at which point he began constant texting with his attorney, which is perfectly fine that he is texting his attorney, but it was something interesting that that was the only portion of the testimony that resulted in that. He was also obviously very evasive on the court date when I asked him where he was appearing from. He said the library. And when I asked him to show me around the room, he disconnected and he never reconnected, which resulted in the order that he was to appear here today, which he has done."

¶ 52 A best interest hearing was conducted on January 10, 2024. At that hearing, Varney testified as follows: A.D., M.D., C.D., and I.D. were placed in traditional foster care with Dave and Laura K. The home was a very large two-and-a-half bath home with a "bonus room." Each of the children had their own area to sleep and separate areas to play in the home. Dave and Laura paid for A.D. and M.D. to attend a private school in Elgin, as they were not satisfied with the quality of education the children were receiving from public school. C.D. attended preschool through the school district because it had a speech therapy program which was unavailable through a private school. Varney observed that A.D., M.D., C.D., and I.D. seek out Dave and Laura for comfort while at their foster home. They would initiate hugs and physical affection and appeared to be bonded to Dave and Laura.

¶ 53 Varney continued that Dave and Laura were committed to providing for the children's needs and were willing to grant permanency to the children. Because Dave and Laura were in their sixties, they were required to obtain a medical release to be considered for permanent placement. They had done so, and the release found them to be in good health to care for the children.

¶ 54 T.D. was placed with his maternal grandparents, Madge and John F. T.D.'s half-brother, Crissy's adult son from a prior relationship, also lived in the home. Dave and Laura had discussed

sibling visitation with Madge, and they were all willing to continue sibling visitation should they adopt the children. They had even scheduled additional visits with T.D. on occasions where one of the children had to miss a sibling visitation with Chris and Crissy.

¶ 55 Adoption had not yet been discussed with the children, however, M.D. expressed that Crissy was crying during their most recent visit and told M.D. that she was crying because she was worried that the children would be adopted. There was no question in Varney's opinion that the children loved Chris and Crissy.

¶ 56 Crissy testified that she believed it was in the best interests of the children for them to be with her. In addition to visitations, Crissy attended any of the children's events she was able to, like report card pick up and choir practices. She testified that T.D. was struggling with his placement because he has a strong bond with M.D. who is his best friend. She further testified that A.D. and M.D. did not identify Dave and Laura as their mom and dad.

¶ 57 According to the guardian *ad litem*'s permanency reports, I.D. was bonded with Dave and Laura and knew no other home. She called them "Mama" and "Dada".

¶ 58 A.D. was thriving under Laura and Dave's care, participating in two different choirs, church services, and summer camps involving coding, science, and robotics. He bonded with Dave over shared interests in the family's fish tanks, cooking, gardening, and music. A.D. had made several friends at school and participated in playdates. However, in therapy A.D. stated that he wants to go home, and says things like, "I know my parents won't fight anymore." He referred to his foster parents as Mr. Dave and Miss Laura.

¶ 59 A.D. has been diagnosed with autism and Laura and Dave are in regular communication with this therapist to make sure they are meeting his therapeutic needs. Likewise, they have worked with A.D.'s school to ensure he receives the educational services he needs.

¶ 60    The permanency reports indicated that M.D. was likewise thriving under Laura and Dave's care. She had made friends in the neighborhood and participated in dance and gymnastics. She would refer to Dave and Laura as Big Daddy and Sweet Mama, monickers originated by C.D. She had a good understanding of what was going on around her with regard to the proceedings. In therapy, she stated that she does not want to go home but also does not want to be adopted. In play therapy, she stated if she found a treasure box, she would give the treasure to the judge for "keeping her safe."

¶ 61    C.D. was making progress in his speech therapy under Dave and Laura's care. Though he was too young to express his wishes regarding care, the reports stated that he is bonded with Dave and Laura, giving them the monikers Big Daddy and Sweet Mama.

¶ 62    Regarding T.D., the separation from his parents and siblings had been difficult. Throughout the pendency of the case, T.D. participated in two partial hospitalization programs, exhibiting behaviors consistent with attention deficit hyperactivity disorder, depression, and anxiety. He demonstrated extreme anger and an inability to control his emotions. He has also demonstrated suicidal ideation, saying things like "I'm tired of everyone lying to me." His therapist believed that he needs a supportive permanent placement. T.D. was affectionate towards his grandparents and spoke positively about his half-brother.

¶ 63    Following argument, the trial court found it was in the best interests of the children to terminate Chris and Crissy's parental rights, stating "You [Crissy] have made your first priority [Chris]. That's not your children. And that is an error on your behalf, [Crissy]. Your insight, judgment, and problem solving are compromised and maladaptive is what that report found and it continues to be accurate in this Court's opinion." The trial court emphasized the need for stability for all of the children and highlighted the ways in which they were cared for in their placements.

¶ 64    Crissy timely appealed.

¶ 65                                    II. ANALYSIS

¶ 66    On appeal, Crissy challenges the trial court's finding that it was in the best interest of the minor children to terminate her parental rights. Specifically, she argues that based on the testimony it is evident that Crissy and the children love each other and share a close bond. She maintains it would be in the children's best interest not to terminate parental rights because: "(1) all of her minor children would be together instead of having T.D. separated from the other children, (2) adopting the four children separately from T.D. would legally not make them siblings anymore, that would devastate him and he is already talked about harming himself (4) [*sic*] it would ensure A.D. gets treatment for his sensory processing disorder because Crissy[] would ensure that he gets to those appointments, and (5) [Chris] is out of the home." She also argues that there is no evidence to suggest that the children were not receiving proper food or water.

¶ 67    We will not reverse a trial court's finding that it is in the best interest of a child to terminate their parent's parental rights unless those findings are against the manifest weight of the evidence. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 43. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented" *Best v. Best*, 223 Ill. 2d 342, 350. At a best interest hearing, the State bears the burden of proving by a preponderance of the evidence that it is in the child's best interest to terminate the parent's parental rights. *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 43. The Juvenile Court Act of 1987 directs that,

           "Whenever a 'best interest' determination is required, the following factors shall
           be considered in the context of the child's age and developmental needs:

                   (a) the physical safety and welfare of the child, including food, shelter,

health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 68 Regarding Crissy's claim that Chris is out of the home, the trial court reasonably did not credit this assertion and neither do we. See *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24

("The trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the child"). At the fitness hearing Crissy denied that Chris was living at the home on June 11, 2021, but could not recall when he moved out or why, nor when Chris moved back in. Shortly after the incident, she and Chris were married. During the fitness hearing, Chris appeared via Zoom on an account with the name "Crissy," despite supposedly being separated for over a year following the birth of I.D. Further, on December 12, 2023, Chris appeared via Zoom in a different room than he previously had. The trial court was concerned that the room was unsecure and asked to be shown the room. Chris immediately disconnected and did not return to the call. Taken together, everything suggests that Crissy had chosen to remain with Chris but told the court and DCFS that she had terminated the relationship in an attempt to retain custody of her children.

¶ 69    Regarding the separation of T.D. from his other siblings, the record presents legitimate concerns regarding the effects of being separated from his siblings and parents. However, reversing the trial court's decision regarding best interests would not mean that the family would be reunified. Crissy would still need to demonstrate that she is capable of caring for the children and complete the services in her service plan, which Crissy has not demonstrated she is capable of. T.D.'s therapist had emphasized his need for a supportive permanent placement. The record shows that T.D. was affectionate with his grandparents and had a good relationship with his half-brother. T.D. said himself, "I'm tired of everyone lying to me," such as when Crissy lied about Chris being in prison. Crissy's prioritization of her husband and her self-conceit over addressing the needs of her children shows neither support or the capacity for permanence.

¶ 70    Even facing the termination of her parental rights, Crissy could not admit that her house was unclean on June 11, 2021, despite incontrovertible video evidence to the contrary, let alone the more serious allegations of Chris's domestic violence or her and Chris's psychological issues.

Further, because we do not credit her assertion that she and Chris have separated, reunification would require that she either leave Chris, which she has not done, or that he also complete his services, which he has failed to do. In short, reversal of the trial court's best interest finding would be unlikely to result in timely reunification of T.D. with his other siblings and would serve only to deprive the children of a permanent placement.

¶ 71 As to Crissy's argument that she would ensure A.D. gets treatment for his sensory processing disorder, again reversal would not mean automatic return of the children to her care. Further, the record indicates that Dave and Laura are attending to A.D.'s needs, as they are in regular contact with A.D.'s therapist and his school regarding his therapeutic and educational needs.

¶ 72 Regarding the argument that there is no evidence to suggest that the children were not receiving proper food or water, that was never an allegation of neglect in this case.

¶ 73 Undoubtedly, Crissy and the children love each other. The record contains nothing to suggest otherwise. However, love alone is not enough to ensure the health, safety, and best interests of a child, nor to shield them from abuse and neglect. The trial court determined that Crissy had failed to make reasonable efforts or progress towards reunification for any of the nine-month periods. The older children were in foster care for over two and a half years by the time of the best interest hearing. The record demonstrates that the children placed with David and Laura have bonded with them and they have demonstrated that they are able to attend to the children's needs. A.D., M.D., and C.D. are attending school, church, and extracurriculars. I.D. has known no other home. As for T.D., he has the support of his maternal grandparents and half-brother, who are committed to providing for his needs. Further, both sets of foster parents have expressed their willingness to maintain the bonds between T.D. and his siblings.

¶ 74    Accordingly, we find that the trial court's finding that it was in the best interest of the children to terminate Crissy's parental rights was not against the manifest weight of the evidence, and we affirm the judgment of the trial court.

¶ 75                                III. CONCLUSION

¶ 76    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 77    Affirmed.