2025 IL App (2d) 240475-U
No. 2-24-0475
Order filed January 15, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re M.Y., Jr., a Minor | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| | ) | |
| | ) | No. 21-JA-51 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Sarah Gallagher Chami, |
| Appellee v. M.Y., Sr., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that the State proved by clear and convincing evidence that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare was not against the manifest weight of the evidence.  As such, and because respondent does not challenge the best-interest phase of the analysis, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 2    In this case, respondent appeals the trial court's decision finding him unfit on all four counts of the petition for termination of parental rights.  For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4    Respondent is the biological father of M.Y., Jr., who was born on December 1, 2020. His parental rights were terminated on August 2, 2024. M.Y., Jr.'s biological mother's rights were also terminated in the same proceedings but are not at issue in this appeal.

¶ 5                              A.   THE NEGLECT PETITION

¶ 6    On June 24, 2021, the State filed a petition to adjudicate M.Y., Jr., alleging that he is a neglected minor and that his environment is injurious to his welfare. Following a hearing that same day, the circuit court placed the minor in the temporary care of the Illinois Department of Children and Family Services (DCFS). The court's order indicates that respondent was admonished to cooperate with DCFS and comply with the terms of the service plans. M.Y., Jr. was placed in the care of his paternal grandparents.

¶ 7    This case originated when a report was initiated with DCFS stating concern over the well-being of M.Y., Jr. on May 20, 2021. The reporter informed DCFS that the minor's father, respondent, is a registered sex offender and is not allowed to have unsupervised contact with minors. It was also stated that respondent consumed cocaine and had a drinking problem.

¶ 8    A service plan, dated September 14, 2021 was filed with the circuit court. The service plan listed as desired outcomes that respondent would cooperate with DCFS or its designees in order to correct the actions which brought his son into foster care, gain insight into why he consumes illicit substances, and receive professional assistance in overcoming substance abuse issues. A permanency goal was established that M.Y., Jr. would return home within 12 months.

¶ 9    Respondent completed an integrated assessment with DCFS on October 13, 2021. Of note, he reported having a prior criminal history including charges of domestic violence and convictions of aggravated DUI and aggravated criminal sexual abuse. He was sentenced to 3 years in prison for his conviction of aggravated criminal sexual abuse and is required to register as a sex offender

for 10 years. Respondent reported that he ultimately served five years in prison due to lack of residency upon his release. He stated that his 16-year-old niece was living with his parents, and he was not allowed to live with them due to this. The integrated assessment indicates that respondent was recommended to comply with random drug screens, attend and successfully complete an anger management course, and attend and successfully complete individual counseling.

¶ 10    On December 10, 2021, an order was entered adjudicating M.Y., Jr. as neglected because someone responsible for his care has a substance abuse issue that impairs his or her ability to properly parent, thereby resulting in a risk of harm.

¶ 11                    B.  THE PERMANENCY REVIEWS

¶ 12    On January 28, 2022, a report by Children's Home Association was filed in the trial court, alleging that respondent had physically assaulted the minor's mother, S.G. S.G. reported that respondent grabbed her hard enough to cause injury to her ribs and wrist. She also reported that he broke her friend's car mirror, broke into her friend's car, and stole her book bag. The writer of the report confirmed that respondent was arrested for felony domestic battery, felony theft, and misdemeanor criminal damage to property. Respondent was in the custody of the De Kalb County Jail at the time of the report. On February 3, 2022, Court Appointed Special Advocates (CASA) filed a court report indicating that respondent had begun engaging in services the first week of October 2021 for his mental health and substance-abuse issues. The CASA report also indicated that respondent had four pending criminal cases, with the most recent charges occurring on January 22, 2022, against him for domestic battery against S.G. Further, CASA reported that respondent was staying with S.G. at a hotel. He reported his employment to be helping S.G. at the hotel occasionally and selling "junk" for profit.

¶ 13    On April 19, 2022, a report was filed with the court indicating that respondent was recommended to engage in individual counseling, attend domestic-violence services, and complete random drug drops. At the time of the report, respondent was still in custody based on the January incident. The report indicated that respondent had four pending criminal cases open in De Kalb County.

¶ 14    On May 25, 2022, a permanency report was filed with the trial court. The permanency report had sections to mark whether there was "satisfactory progress" or "reasonable efforts" made towards DCFS's goal. Each section was marked "no." As further explanation, the report stated that respondent was rated as unsatisfactory regarding cooperation with DCFS because he was not meeting with his caseworker as directed. He was rated unsatisfactory regarding completion of a substance-abuse assessment. Respondent indicated that he cooperated with DUI and alcohol counseling for an updated assessment, but the records provided showed that the assessment was completed prior to DCFS involvement. He completed a drug drop on October 8, 2021, that was positive for THC and failed to appear for drug drops on November 30, 2021, December 2, 2021, December 30, 2021, and January 20, 2022. The report further indicated that respondent had recently begun visits with M.Y., Jr. because he had been released from jail in May of 2022 and that respondent was "of the belief that he can see [M.Y., Jr.] whenever he wants to." A family service plan was filed with the report. The family service plan indicated that prior to his incarceration, respondent was refusing to meet with his case management team.

¶ 15    On June 1, 2023, a report was filed by CASA. This report noted that respondent's mother stated that respondent had always had issues controlling his anger. Additionally, the report noted that respondent had not enrolled in domestic-violence services which were recommended by DCFS and required as a condition of his parole. The reporter noted that as of May 19, 2022,

respondent had two post-sentence criminal cases open, related to the events on January 22, 2022. He was found guilty on charges of theft and domestic battery. On June 3, 2022, the circuit court entered an order, following a permanency hearing, finding that respondent had not made reasonable efforts towards the goal.

¶ 16    On November 22, 2022, an updated permanency report was filed in the trial court. The report was again checked "no" regarding whether respondent had made reasonable efforts or progress towards the goal. The report indicated that respondent's cooperation with DCFS was unsatisfactory. It was noted that on August 18, 2022, he was speaking with a placement supervisor and, during the conversation, threatened to kill all the DCFS employees. Respondent was subsequently banned from DCFS offices and charged with telephone harassment. He was rated unsatisfactory regarding substance-abuse recommendations. Though he did complete an assessment, he refused to engage in substance-abuse services, telling DCFS that he did not believe he had problems with drugs or alcohol. Further, his progress towards individual counseling was unsatisfactory. Although respondent was attending, his therapist reported that he was engaging very little and stating that he didn't feel that he needed to be there. Additionally, he was recommended to participate in a sex-offender assessment and refused, stating that his past could not be used against him.

¶ 17    The report further stated that on August 27, 2022, respondent was arrested for domestic battery to S.G. The report indicated that these charges were from an incident where respondent was intoxicated and became physically and verbally assaultive. S.G. got an emergency order of protection against respondent after the incident. On August 31, 2022, he was arrested again for violating the order of protection. A family service plan was filed along with the report. The service plan evaluated respondent as unsatisfactory regarding the goal of visiting M.Y., Jr. consistently

because he had been visiting with M.Y., Jr. but the visits were "sporadic and not on designated days or times as requested." Further, respondent was unable to visit with M.Y., Jr. consistently because he had been incarcerated. The family plan did rate respondent's progress as satisfactory regarding cooperation with random drugs screens. It indicated that he had completed drug screens. However, it noted that he reported to DCFS that he felt as though he should not have to complete drug screens for DCFS because he was completing them for probation in his criminal cases. After a DCFS worker spoke to his probation officer, DCFS was informed that respondent told probation that he was completing drops for DCFS and thus should not have to do them for probation. The progress plan stated that the "miscommunication led to [respondent] not being dropped by either entity regularly." The family plan also gave additional insight into respondent's lack of engagement with individual counseling. His counselor reported that although he was attending counseling regularly, respondent did not believe that he needed therapy and stated that after he left prison, he was a "changed man" and his dynamics with S.G. had "never been better."

¶ 18    On November 29, 2022, CASA filed a report with the trial court. The report noted that respondent had two open post-sentence matters in De Kalb County (theft and domestic battery) as well as three pending criminal matters (domestic battery, telephone harassment, and violating an order of protection). The report also noted concerns raised by DCFS and CASA that he was at the foster home more often than his scheduled visitation time. Further, respondent failed to appear for a meeting at the jail with his caseworker to discuss his case and services. An order following a permanency hearing was filed on December 2, 2022, finding that respondent had not made reasonable efforts or reasonable progress towards DCFS's goals.

¶ 19    On May 19, 2023, an updated permanency hearing report was filed in the trial court. The report was again checked "no" regarding whether respondent had made reasonable efforts or

progress towards the goal. A family service plan was filed with the report. The service plan indicated that, at the time of filing, respondent was incarcerated awaiting sentencing. The May 19, 2023, service plan contained the same or similar evaluations and progress reports as the November 22, 2022, service plan, as respondent had been incarcerated during that period.

¶ 20     On May 31, 2023, a CASA report was filed indicating that M.Y., Jr. had moved to a new foster home. He had been placed with his paternal grandparents but was moved to a traditional foster home on May 4, 2023. The report indicated that the move was due in part to the "grandparents' inability of keeping [respondent] away from the minor, as they were allowing [respondent] to have unauthorized visits." The report further indicated that a hotline call was made on April 14, 2023, reporting allegations of cuts, bruises, welts, abrasions, or oral injuries by neglect when M.Y., Jr. was in the care of his paternal grandparents. These allegations were later deemed unfounded. CASA reported that M.Y., Jr. was adjusting well to his new foster placement. Regarding respondent, CASA reported that he had been released from jail on parole in March 2023. On April 5, 2023, he indicated to CASA that he wanted to surrender his parental rights. The matter was continued to August 11, 2023, for a permanency review.

¶ 21     On August 1, 2023, an updated family service plan was filed with the trial court. The service plan indicated that respondent had begun to cooperate in some respects with DCFS. He was no longer banned from the DCFS building and was seeing his caseworker. Additionally, respondent was visiting M.Y., Jr. regularly, with visits every week for two hours. However, respondent still refused to complete a sex-offender assessment. He did, however, complete a mental health assessment and a substance-abuse assessment for probation, which were forwarded to DCFS. On August 8, 2023, CASA filed a report in the trial court. The report noted that on July 12, 2023, an aid at Hobby Horse, who supervised visitation, reported that respondent smelled of

alcohol during scheduled visitation time. She could not confirm if he was intoxicated, as he "wasn't acting out of normalcy." On August 11, 2023, an order was entered following the permanency hearing finding that respondent had not made reasonable efforts or reasonable progress towards the goal.

¶ 22     On November 8, 2023, a status report was filed in the trial court. The report stated that prior to May of 2023, respondent refused to engage in any services with DCFS. He only began participating in services once M.Y., Jr. was removed from care with respondent's parents and placed in a traditional foster home. Respondent initiated parent education on August 14, 2023, and completed a Partner-Abuse-Intervention-Program (PAIP) assessment on August 21, 2023. He had not yet completed any classes. In the report, DCFS indicated that the case passed legal screening on October 11, 2023, and asked that the goal be changed to "Substitute Care Pending Termination of Parental Rights."

¶ 23     On November 15, 2023, CASA filed a report in the trial court. CASA indicated that the former foster parents, M.Y., Jr.'s paternal grandparents, submitted an appeal regarding M.Y., Jr.'s removal from their care. A review was conducted with the reviewer stating that "the continued disregard of the agency's visitation plan by the [grandparents] is evidence that they cannot see safety threats related to their son, nor can they set appropriate limits and boundaries with their son to maintain their grandson's safety and well-being." It was also noted that "the minor had improved in gross motor skills, coordination, potty training, vocabulary, and social skills" in the new foster setting, and he had been observed "spending a great deal of time in his highchair" at his grandparents' home, "which may have limited his development." The report further noted that respondent had begun engaging in recommended services during the review period. He informed DCFS that he would like to move his visits with M.Y., Jr. to his apartment. In a step towards doing

so, his caseworker asked respondent to provide a safety plan. It was reported that he was reluctant to do so. Following a permanency hearing, on November 17, 2023, the trial court entered an order finding that father had made reasonable efforts but not reasonable progress and changed the goal to substitute care pending court determination on termination of parental rights.

¶ 24                    C.  THE TERMINATION PROCEEDINGS

¶ 25    On December 18, 2023, the State filed a motion for the termination of parental rights and appointment of a guardian with power to consent to adoption alleging that respondent was unfit because he: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to M.Y., Jr.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to protect M.Y., Jr. from conditions within the environment injurious to his welfare (750 ILCS 50/1(d)(g) (West 2022)); (3) failed to make reasonable efforts to correct the conditions that caused the removal of the child during a nine-month period after M.Y., Jr. was adjudicated a neglected minor (750 ILCS 50/1(D)(m)(i) (West 2022)); and (4) failed to make reasonable progress toward the return of the child to him during a nine-month period after M.Y., Jr. was adjudicated a neglected minor (750 ILCS 50/1(D)(m)(ii) (West 2022)).  There were 16 referenced time periods: December 11, 2021, to September 11, 2022; January 11, 2022, to October 11, 2022; February 11, 2022, to November 11, 2022; March 11, 2022, to December 11, 2022; April 11, 2022, to January 11, 2023; May 11, 2022, to February 11, 2023; June 11, 2022, to March 11, 2023; July 11, 2022, to April 11, 2023; August 11, 2022, to May 11, 2023; September 11, 2022, to June 11, 2023; October 11, 2022, to July 11, 2023; November 11, 2022, to August 11, 2023; December 11, 2022, to September 11, 2023; January 11, 2023, to October 11, 2023; February 11, 2023, to November 11, 2023; and March 11, 2023, to December 11, 2023.

¶ 26                                1. Unfitness Hearing

¶ 27    The unfitness phase of the proceedings to terminate respondent's parental rights commenced on April 5, 2024.

¶ 28    The State's first witness was Angie Miller, a caseworker with DCFS. Miller testified that she was the current caseworker for respondent. She explained that when M.Y., Jr. came into care, respondent completed an integrated assessment and was recommended to complete individual counseling, domestic-violence counseling, and parent education, and to cooperate with DCFS. He completed parent education and engaged in mental-health counseling. Miller testified that despite initially engaging in mental health counseling, respondent stopped attending because he was not making progress. Specifically, Miller testified that she received reports from respondent's counselor that respondent was not making progress related to taking responsibility for how his actions had caused his son to go into care. Further, respondent would get defensive and angry when the topic was broached. Miller testified that when respondent was out of jail, he would regularly visit M.Y., Jr. Respondent had been out of jail for approximately a year. However, there was some difficulty initially upon his release in getting the visits set up. Miller testified that DCFS suggested that visits occur at places like the library, McDonald's, or parks. However, the agency Help at Home told Miller that respondent had communicated to them that he was not allowed to go to those places. Miller testified that respondent was not able to do visits at DCFS offices because he had been banned for threatening the staff. Additionally, Miller testified that it was her belief that if respondent were to engage in his services that day, and everything were to go perfectly, it would still be unlikely that M.Y., Jr. would be able to return to respondent's care by a date certain within the next five months. In her experience, there was not a case that had ever gone "absolutely perfectly," and accordingly, she also did not believe, to a reasonable degree of certainty, that it was likely that M.Y., Jr. would be returned to respondent's care within the next year. She based

these opinions on respondent's prior lack of engagement and completion of services. At the conclusion of this portion of Miller's testimony, the trial court took judicial notice of the original petition filed in this case, the adjudicatory orders, testimony provided at those hearings, relevant and admissible portions of any reports filed for permanency review, as well as any testimony provided at permanency and dispositional hearings.

¶ 29    On cross-examination by respondent's counsel, Miller testified that she took over this case in October 2022 and did not know the original caseworker. However, she did review services plans with the caseworker on the case directly before her. The two went over service plans and documentation and discussed what services respondent had completed and which he had not. Miller testified that the case did not originate in the geographical area she worked. Although respondent complained that services were not offered by the caseworker in his original area, Miller indicated that she was not aware of the veracity of such statements. She further testified that respondent had been receiving mental-health counseling from Braden Center, because they could provide services virtually. Respondent told Miller that he needed virtual therapy because he did not have a driver's license. He stopped attending therapy when DCFS changed his goal. When his goal changed, DCFS no longer paid for counseling, which is why respondent stopped attending. Respondent did complete a substance-abuse evaluation through probation for his criminal cases, which DCFS accepted. Respondent was not recommended additional treatment after the substance-abuse evaluation. Additionally, respondent completed his parenting class. Miller testified that respondent usually answered her calls. She was aware that respondent had signed up for domestic-violence counseling, but she was unsure whether he was actively engaged. When asked if respondent was "allowed almost unlimited access" to M.Y., Jr. at the beginning of this

case, Miller responded that she did not believe that to be true. Further, Miller testified that respondent was not uncaring about M.Y., Jr.

¶ 30    Regarding DCFS goals, Miller summarized that she believed the "two major things" that respondent needed to complete were mental health counseling and domestic-violence counseling. She stated that if a person is receptive to a PAIP class, it can generally be completed in 26 weeks. While she agreed that there is no definitive end date for mental-health counseling, Miller said it is "not necessarily" difficult to put a timeline on counseling, as there should be some kind of engagement or progress with counseling within nine months. Although she agreed that beginning in May, respondent had made some efforts, she could not agree that respondent had made any progress towards his goals. She explained that respondent never told her directly that he was unable to do visits at the places she suggested, but rather he told the worker supervising visits at Hobby Horse. She agreed that he did not turn down the locations simply because he did not like them but stated that he was unable to based on his behaviors or his past. Miller also confirmed that respondent had some trouble finding housing after being released from jail. She had to contact respondent's mother to communicate to respondent that he needed to speak with her. When respondent was looking for housing, she suggested a homeless shelter, but respondent was not allowed to stay at homeless shelters. DCFS was unable to help with funding for public housing because respondent did not have a definite return-home date, which was required.

¶ 31    On cross-examination by the attorney representing the minor, Miller clarified that respondent began mental-health counseling in late summer of 2023. To her knowledge, Miller could only recall respondent attending mental-health counseling at Braden. She clarified that she had never received from respondent proof of completion of domestic-violence classes.

¶ 32    On cross-examination by the attorney for CASA, Miller testified that there was one event that occurred that was out of ordinary when respondent was visiting with M.Y., Jr. She explained that it had been reported to her by the woman supervising the visit that when respondent arrived, the woman could smell alcohol on his breath. This event occurred on July 5, 2023. Miller explained that the visit continued, but the woman supervising told respondent that if she ever smelled alcohol on him again, she would end the visit. Regarding mental-health counseling, Miller explained that respondent stopped attending when the goal changed. Thus, he attended through October and into November. She received no more progress notes on respondent's counseling sessions after October of 2023. Miller was unsure when respondent's last mental-health evaluation was taken.

¶ 33    On cross-examination by an attorney for DCFS, Miller stated that she had been the caseworker on cases where the goal was changed from return home to "subcare" pending a termination of parental rights. She explained that DCFS informed respondent that it would no longer pay for his counseling because of the goal change, but that respondent was still able to attend counseling. When Miller started working on respondent's case, he was not engaged in counseling.

¶ 34    On redirect examination, Miller recalled an incident where she was informed that respondent threatened to kill DCFS staff. She stated that he never apologized for his actions and instead threatened to sue DCFS. Further, she clarified that the reason why respondent was unable to set up visitation at certain locations was due to his status as a sex offender, not for a reason that was "intrinsic." Rather, it was "a consequence of his own actions."

¶ 35    Respondent was then called by his attorney to testify. He stated that his child was taken into care in June of 2021 and he had been to every court date since. Respondent stated that he had completed an integrated assessment and was requested to complete a substance-abuse evaluation.

However, he stated, that DCFS could not give him a referral for a substance-abuse evaluation because it had "no contracts" in his area. He stated that he "started making phone calls" until he got in contact with someone who helped him switch caseworkers in either August or October of 2022, when he could finally begin services. When asked to clarify if he meant October of 2021 or October of 2022, he replied that he was offered services up until the time he switched caseworkers but was told that "they had no contracts." Respondent indicated that he obtained a substance-abuse evaluation at DUI Behavioral Health after he completed the integrated assessment.

¶ 36 Regarding visitation, respondent stated that when M.Y., Jr. was placed with respondent's parents, visitation was "kind of chaotic" because they were "switching with caseworkers all the time" and the different caseworkers were telling him he was allowed different amounts of visitation time. In the last "probably eight, nine months of it," he averred that DCFS "finally cracked down of [*sic*] once a week two-hour visits." Respondent recalled that initially in his case, his first caseworker did not care how much he saw his son, as long as the visits were supervised. At that time, respondent was exercising visitation every day. Respondent testified that when M.Y., Jr. was placed with respondent's parents, he would help provide for his son. He stated that he would buy diapers, clothes, and food. M.Y., Jr. was on respondent's Link card for a time, but respondent stated that "[t]he Link card didn't go on for very long because they caught on to that pretty quickly."

¶ 37 Respondent additionally testified that DCFS did not recommend that he complete any services until his caseworker was switched at some point in 2022. However, prior to incarceration, he did attend some individual counseling. He attended Braden and stated that this counseling took place from June until the end of August in 2022, "when another incident had came [*sic*] up." Respondent stated that he did not participate in any other services at that time and was not offered

services while he was incarcerated from August of 2022 to March of 2023. Further, respondent maintained that it was difficult to stay in contact with his caseworker while he was incarcerated. When he was released, respondent was homeless and did not receive assistance in finding housing. He stated that he found an apartment and was in a stable living situation, so he tried to set up visits with M.Y., Jr. at his apartment. Respondent explained that there were issues in setting up visits because DCFS suggested places he was legally prohibited from due to his "felony charge." Regardless, respondent was able to begin visits with M.Y., Jr.

¶ 38   Regarding DCFS recommendations, respondent testified that he completed a parenting class and began domestic-violence classes at Safe Passage. He stated that he was about halfway through with domestic-violence treatment, or approximately 12 to 14 classes. He estimated that he could finish the classes in four months. Further, respondent reported that he attended counseling at Braden around June or July 2023 and continued to attend until October 2023, when the goal changed. He testified that when the goal changed, counseling was not fully discontinued. However, he found it too expensive to continue attending.

¶ 39   Finally, respondent testified to additional information he thought the trial court should know. He stated that after the courts told him, "you have one last chance," he began engaging with DCFS. He was beginning to engage in services until the goal was changed. He indicated that he had put himself on waiting lists for counselors that worked with his insurance, but he was struggling because certain places were too far away and he could not drive there. Further, he believed that he had made "a big change in [his] life to make the right steps forward" and the trial court should be able to see that he was in a different place than he was six months earlier. He believed that he could finish all DCFS recommendations within five months except for counseling.

Of counseling, he opined that he could not make progress because DCFS was "drilling to them" that respondent made certain threats. Respondent would not admit to those threats.

¶ 40    On cross-examination by the attorney for the minor, respondent testified that he had been to counseling with Braden twice. The second time was a better experience than the first. However, he was not surprised to learn that his counselor would describe him as angry and defensive during sessions, stating that "anybody's going to get angry and defensive."

¶ 41    On cross-examination by an attorney from CASA, respondent stated that he had been attending domestic-violence counseling consistently through Safe Passage. He stated that he was not currently attending mental-health counseling because he could not afford it. When asked if he had sought any resources to obtain mental-health counseling at a reduced price, respondent stated that he had insurance but that there was a long wait list. He could not attend certain providers of mental-health counseling because they did not provide telehealth services. Respondent knew that he was on a wait list for treatment with Braden counseling but was unsure whether he was on a wait list with Ben Gorden counseling because he did not "care for" their services. Respondent further opined that mental-health counseling was a class that he needed to attend. When questioned as to whether he had been participating in sessions after describing counseling as a class, respondent replied that he was "obviously" participating because it was one-on-one. Respondent testified that mental-health counseling was not unhelpful, but one focus was to get him to admit to threats made to DCFS. When asked if he believed that he had anger issues, respondent stated that "everybody has an anger issue to a certain extent." He did not believe that his anger problem is one that he cannot control. Finally, respondent testified as to why he had begun to make progress in his case. He explained that after finding himself in a spiral and realizing that he could lose his

child, he made the decision to stay out of jail "one day[,] and ever since then [his] life has turned around a hundred percent."

¶ 42    On cross-examination by the State, respondent testified that he completed substance-abuse counseling after his 2014 convictions for aggravated DUI and domestic battery. The State then rested its case.

¶ 43    On May 17, 2024, the court rendered its decision, finding that the State met its burden of proving respondent unfit on all four counts alleged in the motion for termination of parental rights. In issuing its oral ruling, the trial court noted that for the totality of the period that M.Y., Jr. was in care, a period of nearly three years, respondent had never made reasonable progress and had only once made reasonable efforts towards the goal. Respondent did not actively engage until May of 2023, and that engagement "might have been an interest in the services." The court asserted that this was "not a situation where you decide you're going to engage in services and the next day you're engaged." It noted that there were periods of time when respondent was incarcerated, but that he was not always incarcerated from the date of adjudication, December 10, 2021, until May of 2023. Rather, there were periods when he was out of custody and was not engaging in services.

¶ 44    The trial court commended respondent for engaging in services but stated that it must consider the case in its totality. Looking at the case before it, the court noted that despite respondent engaging in services, there were still services that had not been completed and were not near completion. Some of the services that were completed, such as the substance-abuse evaluation, were completed at the direction of the criminal courts, and despite being accepted by DCFS, were not completed in cooperation with DCFS.

¶ 45    Although the trial court acknowledged that respondent was consistent with visiting M.Y., Jr., it stated that "it is not only what you do when you are in the presence of your child, but it is

- 17 -

what you do and how you grow as a person even when you are away from the child that ***

matures you as a person and as a parent." It cited that as a continuing concern, as evidenced by

DCFS testimony and reports from respondent's counselors. Accordingly, the trial court found that

the State had proven by clear and convincing evidence that respondent was an unfit parent.

¶ 46    Upon finding respondent unfit, the court scheduled a date for the best-interest phase of the

termination proceedings. The trial court found it in the best interest of M.Y., Jr. to terminate

respondent's parental rights.

¶ 47    This appeal followed.

¶ 48                                   II. ANALYSIS

¶ 49    On appeal, respondent argues that the trial court erred in granting the State's motion for

termination of parental rights on each count because the findings of unfitness were against the

manifest weight of the evidence. Specifically, respondent argues that the trial court's findings were

against the manifest weight of the evidence when it found that respondent failed (1) to maintain a

reasonable degree of interest, concern, or responsibility as to the welfare of M.Y., Jr.; (2) to protect

the M.Y., Jr. from conditions within his environment injurious to his welfare; (3) to make

reasonable efforts to correct the conditions that were the basis for the removal of M.Y., Jr. in any

9-month period after the adjudication of neglect; and (4) to make reasonable progress towards the

return of M.Y., Jr. within any 9-month period after the adjudication of neglect.

¶ 50    At the outset, we note that the State argues that respondent forfeited the first two of these

arguments by failing to cite any legal authority on these matters. Respondent's argument section

for these two sections contains only one irrelevant citation to legal authority and merely argues

that the trial court erred based on a recitation of the testimony from the unfitness hearing. A

reviewing court is entitled to have the issues clearly defined with pertinent authority cited and

is not simply a repository in which the appealing party may foist the burden of argument and research. *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75 (2010) (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)). Points not developed are forfeited. *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 70. However, because "the forfeiture rules are admonitions to the litigants rather than a limitation on our jurisdiction, we may override considerations of waiver and forfeiture to achieve a just result and maintain a sound and uniform body of precedent." *Williams v. McAllister Nursing and Rehab, LLC*, 2024 IL App (1st) 231805, ¶ 34. Because a biological parent's right to raise his or her child is a fundamental liberty interest and involuntary termination of parental rights is a drastic measure *(In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), we will address the arguments of respondent on the merits. *In re C.R.*, 2024 IL App (4th) 231441-U, ¶ 20 (addressing termination on the merits despite briefing failures); see also *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30, (trial error found forfeited but still addressed on the merits).

¶ 51    It is well settled that "[W]hen parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court."  *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004) (citing *In re D.D.,* 196 Ill. 2d 405, 433 (2001)). Hence, if we affirm the trial court's decision on one ground, we need not consider the court's decision on the other grounds. Accordingly, we turn to respondent's third argument, that the trial court erred in finding that respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of M.Y., Jr. in any 9-month period after the adjudication of neglect.

¶ 52    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that

the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). See 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 53    Count III of the motion for termination of parental rights alleged that respondent was unfit pursuant to section 1D(b)(m)(i) of the Adoption Act. That section provides that a parent may be found unfit for failure "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1D(b)(m)(i) (West 2022). "Reasonable effort is a subjective standard, focusing on the amount of effort that is reasonable for the particular parent whose rights are at stake." *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000). Reasonable efforts relate to the goal of correcting conditions that were the basis of removing the child from the parent. *Id*.

¶ 54    Respondent argues that the trial court erred in finding that he failed to make reasonable efforts towards reunification. He argues that the trial court failed to consider that he began complying with DCFS after the charge of telephone harassment of DCFS was dismissed. He contends that he had begun to engage in services and simply needed more time to complete them.

¶ 55    As evidence that he did make reasonable efforts, respondent argues that he cooperated with DCFS to sign releases, obtained stable housing, adhered to the visitation plan, submitted to a drug and alcohol assessment, engaged in individual counseling, and began domestic-violence counseling.

¶ 56    Respondent's service plans indicate that M.Y., Jr. was taken into care based on a report that respondent was a registered sex offender and not supposed to have any unsupervised contact with children. Further, it was reported that respondent was consuming cocaine and had a drinking problem. Respondent's service plan required him to: cooperate with DCFS and sign all necessary consents for release of information; obtain and maintain stable housing conducive to the safety and healthy rearing of the minor; successfully complete individual counseling; successfully complete a domestic-violence program; submit to a drug and alcohol assessment and recommended treatment; visit with M.Y., Jr. consistently; and cooperate with all recommended services.

¶ 57    The record reflects that for the majority of the 16 9-month periods alleged in the petition, respondent did not make reasonable efforts to correct the conditions that were the basis for removal. For example, in the 9-month period from January 11, 2022, to October 11, 2022, a DCFS permanency report admitted into evidence at the termination hearing dated May 25, 2022, indicated that respondent was not meeting with his caseworker as directed. Although he reported that he cooperated with DUI alcohol counseling for an updated assessment, the records provided from the agency showed his assessment was completed prior to DCFS intervention. Additionally, he failed to comply with drugs screen on four dates and tested positive for marijuana at the one drug drop he did complete.

¶ 58    During another 9-month period alleged in the petition, April 11, 2022, to January 11, 2023, as indicated by the November 22, 2022, permanency report, respondent was communicating with DCFS. However, after threatening to kill the employees at DCFS, he was banned from their offices. He also failed to make reasonable efforts towards the goals regarding substance abuse, as he refused to follow the recommendations, stating his belief that he did not have issues with drugs or alcohol. In that review period, he was arrested for domestic battery after becoming verbally and physically abusive while intoxicated. Respondent also failed to make reasonable efforts with counseling. Although he attended counseling, his therapist reported that respondent was engaging very little and that respondent did not believe he needed to be there. Further, respondent refused to complete a sex-offender assessment, stating that he should not have to because he had already served time in prison for his sex offense. With respect to the allegations regarding the time period from August 11, 2022, to May 11, 2023, a permanency report filed May 19, 2023, indicated that respondent had been incarcerated, was not completing services while incarcerated, and had very little communication with his caseworker while incarcerated. After being released from jail, respondent struggled to find housing. After obtaining an apartment, respondent was reluctant to create a safety plan requested by his caseworker to host visits with M.Y., Jr. When he was not incarcerated, respondent was often exercising sporadic parenting time at his own discretion, leading to M.Y., Jr.'s removal from care with respondent's parents and being placed into traditional foster care. Prior to M.Y., Jr.'s move to traditional foster care, respondent indicated to CASA that he wanted to surrender his parental rights.

¶ 59    We do note that the DCFS report filed November 8, 2023, indicated that respondent finally began making efforts towards correcting the conditions leading to DCFS intervention. The report noted that prior to May of 2023, respondent "refused to engage in any services." He only began to

participate in services when M.Y., Jr. was moved into traditional foster care. He had begun parent education on September 14, 2023, resumed counseling on August 14, 2023, and began a PAIP on August 21, 2023.

¶ 60 On November 17, 2023, the trial court entered its first order finding that respondent had made reasonable efforts. At no time prior to this order had respondent been found to have made reasonable efforts to correct the conditions that removed M.Y., Jr. from his care, and DCFS consistently found his efforts to be unsatisfactory. Respondent, in his own testimony, admitted that he was told he had "one last chance." He thereafter began engaging more in DCFS services, but as the record reflects, that was not until at least May of 2023. Because respondent argues that he "made great effort" and the November 17, 2023, order states that "he had made reasonable effort but not progress," respondent urges us to find that the trial court's finding was against the manifest weight of the evidence.

¶ 61 The Adoption Act provides that a parent may be found unfit for failure to "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during *any* 9-month period following the adjudication of neglected or abused minor." (Emphasis added.) 750 ILCS 50/1D(b)(m)(i) (West 2022). Based on the record before us, it is clear that respondent failed to make reasonable efforts in *many* of the nine-month periods following adjudication. Accordingly, we cannot say the trial court's findings were against the manifest weight of the evidence.

¶ 62 Even if we were to consider the period that respondent had made reasonable efforts, the trial court also found that respondent failed to make reasonable progress in any of the 16 9-month periods following adjudication. Respondent argues that in this case, the trial court erred in "mistakenly overlook[ing] much of the progress made by" respondent.

¶ 63    Count IV of the motion for termination of parental rights alleged that respondent was unfit pursuant to section 1D(b)(m)(ii) of the Adoption Act. That section provides that a parent may be found unfit for failure to make reasonable progress toward the return of the child to the parent during *any* 9-month period following the adjudication of neglected or abused minor. 750 ILCS 50/1D(b)(m)(ii) (West 2022).

¶ 64    Reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id*. Here, the trial court found that respondent never made reasonable progress. Throughout the pendency of this case, respondent often refused to comply with the services recommended by DCFS, such as alcohol and substance-abuse treatment, counseling, and a sex-offender evaluation. For example, the November 22, 2022, permanency report, which covered the 9-month period from April 11, 2022, to January 11, 2023, respondent was making no progress in individual counseling. Although he completed a substance-abuse evaluation for DCFS at that time, it was noted that he refused the recommended treatment because he did not believe he had substance-abuse issues. Further, in that same 9-month period, respondent also refused to take a recommended sex-offender evaluation because he did not believe his past could be used against him. His caseworker testified that although respondent had begun making efforts in 2023, she did not believe he had begun making progress. She cited as a major concern that prior to the goal change, when DCFS was still paying for individual counseling, respondent was not making reasonable progress. The August 1, 2023, permanency report, covering the 9-month period from October 11, 2022, to July 11, 2023, indicated the respondent continued to refuse certain recommendations such as a sex offender evaluation and treatment. Finally,

although respondent argues that services were not available to him with his first caseworker or when he was in jail, we find this argument unconvincing. As the record reflects, there were periods of time when respondent was serviced by his current or former caseworker, was not incarcerated, and refused to comply with services recommended to him.

¶ 65    In sum, we cannot say that the trial court's determination that respondent was unfit as to count III or IV because he failed to make reasonable efforts or progress was unreasonable, arbitrary, or not based on the evidence.  As such, and because respondent did not appeal the trial court's decision that it was in the minor's best interest that his parental rights be terminated, the trial court's decision to terminate respondent's parental rights is affirmed.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 68    Affirmed.